524 A.2d 913

**COMMONWEALTH of Pennsylvania**

v.

**Salvatore CHIMENTI, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 18, 1986.

Filed April 20, 1987.

352

Paul L. Shechtman, Philadelphia, for appellant.

Marianne E. Cox, Deputy District Attorney, Philadelphia, for Com., appellee.

Before OLSZEWSKI, TAMILIA and KELLY, JJ.

OLSZEWSKI, Judge:

Appellant appeals from the judgment of sentence imposed after a jury found him guilty of first-degree murder and possession of an instrument of crime. The trial judge sentenced appellant to the mandatory term of life imprisonment on the first-degree murder charge and to a concurrent term of 2½ to 5 years' imprisonment on the possession of an instrument of crime charge. In this appeal, appellant argues that: (1) he was denied effective assistance of counsel because his trial counsel failed to call two witnesses and chose to present testimony that counsel knew was perjurious; (2) he was denied a fair trial because of the prosecutor's misconduct; and (3) the evidence was not legally sufficient to support a first-degree murder conviction.[1] For the reasons stated below, we affirm the judgment of sentence.

---

1. Appellant also argued on appeal that the trial court erred in prohibiting appellant from conferring with his counsel during a trial recess. We, however, find that this issue has not been preserved for our review.

Appellant failed to object to the statement at trial and consequently, this issue is waived on appeal. See *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974) (issue will not be considered on appeal where defendant fails to timely provide the trial court with an opportunity to correct the alleged error); *Commonwealth v. Scoleri,* 432 Pa. 571, 248 A.2d 295 (1968), death penalty vacated, 408 U.S. 934, 92 S.Ct. 2852, 33 L.Ed.2d 747 (1972) (failure to object to trial court's order not to consult with counsel during noon recess constituted waiver). Additionally, appellant failed to raise this issue in his post-verdict motions. Our Supreme Court has consistently held that only those issues included in post-verdict motions will be considered preserved for appellate review. See *Commonwealth v. Gravely,* 486 Pa. 194, 404 A.2d 1296 (1979).

Nonetheless, if this issue was preserved for our review, we would find this issue to be meritless. Appellant was called as a witness in

## I. FACTS

The trial court aptly stated the relevant facts in this case as follows:

On May 10, 1982 the body of Andrew Clifton Tucker was found lying in the street in front of 2747 S. Sheridan Street, Philadelphia. He had been shot 7 (seven) or 8 (eight) times.[1] Only four of these bullets were recovered. All of the recovered bullets were .380 caliber. The ballistics expert, Edward Jachimowicz, testified these had been fired from the same gun. They were extraordinary aluminum jacketed bullets which explode more expansively upon impact.

Officer Andrew Harley was the first to respond to the 11:28 P.M. radio call which reported a shooting at 2747 S. Sheridan Street, the residence of the defendant's mother, Mrs. Emma Chimenti. Upon observing the victim lying in the street, the officer attempted to take his pulse but could find none. He saw a snub-nose .38 caliber gun lying 4 (four) to (six) inches from the deceased's left leg.

his own defense and at the conclusion of his direct testimony, the following exchange occurred:

THE COURT: All right, we will take a luncheon break right now and we will reconvene at 2 o'clock.

I caution you again to maintain your good silence.

Mr. Chimenti, you are under oath and you are about to be cross-examined, so you really shouldn't talk to Mr. Moldovsky at this time, okay?

THE DEFENDANT: Okay.

(N.T. Vol. VIII at 86).

The trial judge aptly explained that she corrected this error:

Just prior to the luncheon recess when the defendant was on the stand, the Court, momentarily forgetting that the defendant was more than an ordinary witness, automatically instructed the defendant not to speak with anyone during the recess. The court reporter left thereupon. The Court, immediately recognizing her error, corrected herself, but the correction was not recorded, in the absence of the reporter. Mr. Moldovsky, who had never missed an opportunity to request a mistrial, never raised the issue. Clearly, had the Court in fact precluded the defendant from speaking to his lawyer, Mr. Moldovsky would have been on his feet protesting. This ephemeral issue emerged only when appeals counsel entered the case and began to comb through the record with a very fine toothed instrument.

(Trial court opinion at 22).

It was later adduced that the victim had been right handed. There was a little blood on the frame of the gun. There also was blood in the street and on the car which was parked between the victim's body and the curb.

Testimony at trial established that the shooting stemmed from an on-going dispute between the defendant, Salvatore Chimenti, and the victim, Andrew Tucker. They had had an argument at the defendant's mother's house three or four days before the shooting. Following this, Chimenti, who had been renting a house from Robert Harris, a friend of Tucker's as well, asked Harris to arrange a meeting between them.

On the night of the shooting Harris and Walter Schiffler went to a Phillies game. They left the game early and went to the Brothers 2 Lounge at 15th and Ritner Streets. There they met the victim, Tucker, who had been drinking, and whose behaviour reflected this fact.[2] Tucker asked Harris to give him a ride to the defendant's mother's house.

The three men left the Brothers 2 Lounge. They went to the victim's apartment so that Tucker could drop off his baseball equipment and pick up some marijuana. They did not smoke it. Harris entered the apartment with Tucker while Schiffler waited in the car. From there the three men proceeded to 2747 S. Sheridan Street.

Upon their arrival, Harris recognized the defendant's brother, Mario, and his friend, Mike Cavanaugh, who were walking out of the house. Mario told Harris that the defendant was not home. Tucker got out of the car, and walked off saying that he was going to a friend's house on the street. Harris stayed to talk to Mario and Cavanaugh. Tucker said he would be at the end of the street and that they should come down and honk for him when they had finished their talk.

Tucker went to 2707 S. Sheridan Street, a house occupied by Theresa Ann Marie Bardon. She was in bed watching TV. Steve Cavalieri, Bardon's boyfriend responded to Tucker's knock. Tucker asked to borrow Bardon's van.[3] Cavalieri decided to drive Tucker so he

told Tucker they would meet at the van. Tucker left. Moments later Bardon and Cavalieri heard shots.

According to Harris' trial testimony, while Tucker was at Bardon's, Harris finished his conversation with Mario and Cavanaugh. He was preparing to leave when another car pulled up behind his. The defendant and Linda Romeo emerged. The driver, a man, never got out.

The defendant asked Harris what he was doing there. Harris explained that he had brought Tucker for the meeting the defendant had requested.

The defendant told Harris that he would "blow (Tucker) away," if the victim started any trouble in front of the defendant's mother's house. Harris had noticed that the defendant had a gun. He also heard the defendant ask his brother if he had his gun. Tucker did not have a gun.[4]

While Harris and the defendant were talking, Tucker left Bardon's house. When he saw them Tucker started to walk toward them, yelling. Harris went to Tucker to attempt to calm him down. He thought Tucker was going to fight with the defendant.

After Harris calmed Tucker, they proceeded to 2747 S. Sheridan Street. The defendant was standing on the steps. Mario and Cavanaugh were on the porch. The defendant accused Tucker of doing things he didn't like. The defendant pointed his finger in Tucker's face. Tucker slapped it away. The defendant drew his gun and shot. Harris ran. He jumped in his car, and Schiffler, who had never gotten out, drove off.

When the defendant took the stand he admitted that he had emptied the entire clip of his gun almost instantaneously. Tucker, he said, never fired a shot. The evidence showed that the defendant had continued to fire at Tucker even as he attempted to run. Bullets entered the front, back, and left side of the deceased.

The defendant's gun was never recovered. The defendant stated that as he ran from the scene of the shooting he dropped his Walther PPKS, a semi-automatic .380 caliber gun, in a vacant lot. He had retrieved this gun

earlier that evening, from a floor safe in a rental property he owned because he knew the victim was looking for him.

Subsequent police investigation revealed that there were spent bullet casings on the steps and on the porch of 2747 S. Sheridan Street. The casings found on the porch were .25 caliber. There was one .25 caliber casing on the sidewalk. The ballistics expert testified that these were fired from a semi-automatic pistol which usually ejects shells over the right shoulder of the shooter.

The defendant ran from his mother's house to his Aunt Betty's and Uncle Frank's. He stayed there for a couple of hours trying to calm down. The defendant's uncle suggested that Joel Moldovsky be contacted for legal assistance. The defendant tried to reach Mr. Moldovsky that evening, but did not succeed until the following day. The defendant retained Moldovsky three days later, May 13, 1982.

Mr. Moldovsky called Homicide Headquarters to determine whether the defendant was wanted. He made several calls between May 13th and May 27th or 28th when he learned that a warrant had been issued for the defendant's arrest. The defendant then voluntarily turned himself over to police custody in Mr. Moldovsky's office. From there Chimenti was taken to the Police Administration Building where he was charged with this crime.

---

[1] According to the testimony of Dr. Marvin Aronson, Head of the Philadelphia Medical Examiner's office, it was impossible to determine the precise number of bullets which had struck the deceased.

[2] The medical examiner testified that the toxicology report revealed that Tucker's blood alcohol level was .11%. This is above the level statutorily defined as drunk for driving purposes.

[3] Tucker was Bardon's friend. He had been helping Cavalieri make some repairs to Bardon's house and had slept there a few times.

[4] Only testimony from defense witnesses suggested that he did. The verdict of guilty of first degree murder indicates that the jury did not believe this evidence was credible.

(Trial court opinion at 4–9) (footnote omitted).

## II. EFFECTIVE ASSISTANCE OF COUNSEL

Appellant's first contention on appeal is that he was denied the effective assistance of counsel. Appellant

argues that his trial counsel failed to call two potential witnesses and suborned perjured testimony. The standard for analyzing ineffectiveness-of-counsel claims consists of a two-pronged test. The reviewing court must first determine whether the issue underlying a defendant's ineffectiveness claim is of arguable merit and, if so, the court must then determine whether the course chosen by counsel had some reasonable basis in promoting defendant's interests. *See Commonwealth v. Pierce*, 345 Pa.Super. 324, 498 A.2d 423 (1985), *allocatur granted*, 510 Pa. 244, 507 A.2d 368 (1986). Additionally, our Supreme Court has recently stated that implicit in this two-pronged test is the requirement that the defendant demonstrate that he was prejudiced by his attorney's alleged ineffective assistance. *See Commonwealth v. Griffin*, 511 Pa. 553, 515 A.2d 865 (1986). For the reasons stated below, we find that the issues underlying appellant's claims of ineffectiveness are meritless.

Specifically, appellant argues that his trial counsel was ineffective because:

He "added" another eyewitness, Gregory Spain, whose race, he believed, would appeal to the jurors. He instructed witnesses to testify that Harris, not Mario Chimenti, was in possession of the .25 caliber gun, so that the attack on appellant would seem even more fearsome. He coached witnesses to testify that Harris was on the porch of the Chimenti house, where the spent .25 caliber cartridges were recovered. And he chose not to call Frank Cioffi and Marie Convery, despite their favorable testimony, because each would have said that Harris was *not* on the porch at the time of the shooting.

(Brief for appellant at 30). First, in reference to appellant's claim that trial counsel was ineffective in failing to call two witnesses, this Court has stated: "the failure to call potential witnesses will not be equated with a conclusion of ineffectiveness absent some positive demonstration that their testimony would have been helpful to the defense." *Commonwealth v. Wallace*, 347 Pa.Super. 248, 252, 500 A.2d 816, 818 (1985). We find that the testimony of the two

potential witnesses would not have been helpful to the defense.

During the trial, appellant contended that the shooting was done in self-defense. Appellant testified that he borrowed $30,000 from Robert Harris and that Tucker, a friend of Robert Harris, had confronted appellant twice previous to the shooting, seeking repayment of the loan. Defense witnesses testified that Robert Harris was on the porch of the Chimenti house and that both Tucker and Harris drew guns on appellant. Appellant, they said, shot Tucker before Tucker could shoot appellant. Gregory Spain also testified for the defense and told the jury that he had driven appellant home on the night of the shooting. Spain testified that Tucker had a gun and that he saw Harris run from the porch with what seemed to be a gun in his hand. On appeal, appellant argues that the testimony of two eyewitnesses—Frank Cioffi and Marie Convery—would have shown that the gun found at Tucker's side could not have been planted. Appellant argues that the two eyewitnesses were walking down South Sheridan Street when they saw the shooting and that no one approached Tucker's body to plant a gun since they stayed with Tucker until the police arrived on the scene. (*See* Brief for appellant at 10). Appellant contends that trial counsel did not call them as witnesses because each would have testified that Harris was not on the porch at the time of the shooting.

■ We find that while the two potential witnesses could have contradicted the Commonwealth's claim that the .38 caliber gun which was found next to Tucker's body was planted, their testimony would have impeached aspects of appellant's self-defense theory. During the trial, defense witnesses had consistently testified that appellant's brother, Mario Chimenti; his friend, Michael Cavanaugh; Robert Harris; and appellant were all on the porch of the Chimenti house at the time of the shooting and that Harris and Tucker each had a gun. By testifying that Harris was not on the porch with a gun at the time of the shooting, the testimony of the two potential witnesses would have cre-

ated confusion in the minds of the jury and may have caused the jury to question the credibility of three of the defense's major witnesses—appellant, Mario Chimenti, and Michael Cavanaugh—who were all on the porch of the Chimenti house at the time of the shooting. The course chosen by trial counsel had a reasonable basis in promoting appellant's interests, i.e., trial counsel's decision to present the testimony of those eyewitnesses who were on the porch at the time of the shooting and who testified that Tucker and Harris both had guns, rather than presenting the testimony of Cioffi and Convery who were walking down Sheridan Street some distance from the scene of the shooting. If defense counsel had chosen to present the testimony of the two potential witnesses, the prosecutor could have readily attacked the accuracy of their view of the shooting and the events that subsequently occurred.

■ Appellant also claims that he was denied the effective assistance of counsel because his trial counsel suborned perjured testimony. Because the burden of proving counsel's ineffectiveness rests on the party alleging it, appellant's burden in this case was to prove that his trial counsel suborned perjured testimony. *See Commonwealth v. Dunbar,* 503 Pa. 590, 470 A.2d 74 (1983) (counsel is presumed to be effective and the burden of proving to the contrary rests on the party alleging counsel's ineffectiveness). We find that appellant has failed to carry this burden.

■ As proof of this allegation, appellant relies on an investigation by the District Attorney's Office,[2] the testimo-

---

2. After trial, appellant retained new counsel who investigated appellant's claim that trial counsel had suborned perjury at his trial. Appellant's new counsel reported his findings to the Commonwealth and offered appellant's cooperation into any potential investigation of trial counsel. Thereafter, and prior to sentencing, the District Attorney's office and appellant entered into an agreement that if appellant would cooperate with the District Attorney's investigation of trial counsel, both parties would enter a plea agreement whereby appellant's conviction would be vacated and he would enter a guilty plea to murder generally, with a certification that the degree of guilt would rise no higher than murder in the third degree. Appellant cooperated in the Commonwealth's investigation of trial counsel. Appellant as-

ny of Elizabeth Harris (Robert Harris' sister), and the addendum attached to his appellate brief which consists of the results of numerous polygraph examinations. The investigative report and the results of the polygraph examinations, however, are not a part of the official record. Our Supreme Court has stated that " 'it is a black letter law that an appellate court cannot consider anything which is not a part of the record in the case.' " *Commonwealth v. Young*, 456 Pa. 102, 115, 317 A.2d 258, 264 (1974) (quoting *McCaffrey v. Pittsburgh Athletic Ass'n*, 448 Pa. 151, 162, 293 A.2d 51, 57 (1972)). We, consequently, cannot go outside the record to consider appellant's evidence. Additionally, Elizabeth Harris, a Commonwealth witness, testified at trial that Gregory Spain, a defense witness, told her that he was going to testify at trial that he witnessed the shooting although he actually had not. After carefully reviewing the record, however, we can find no proof that appellant's trial counsel forced Spain to testify.[3] Since the official record is

serts on appeal that "the District Attorney's Office completed its investigation and substantiated appellant's allegations." (Brief for appellant at 12). The official record of this case, however, is devoid of the Commonwealth's investigative report.

Appellant additionally claims that the Commonwealth should not now contest his entitlement to a new trial on grounds of ineffective assistance of counsel since to do so would constitute a breach of the parties' post-trial agreement. (Brief for appellant at 30). We find that this claim is also without merit. Pursuant to the agreement, appellant and the Commonwealth applied to this Court for an order remanding the case to the trial court which would vacate appellant's sentence and accept appellant's negotiated guilty plea. This Court granted the requested order. Our Supreme Court, however, vacated the remand order finding that this Court lacked authority to direct the trial court to vacate appellant's prior judgment of sentence and to accept appellant's guilty plea. *See Commonwealth v. Chimenti*, 510 Pa. 149, 507 A.2d 79 (1986). As the Commonwealth argued in its appellate brief: "The Commonwealth did not, as defendant contends, renege on its plea bargain negotiations, but rather zealously sought to uphold the plea in the Pennsylvania Supreme Court. That Court rejected the Commonwealth's argument, however, and ruled that the parties could not plea bargain away a valid jury verdict." (Reply brief for appellee at 4).

**3.** For instance, Elizabeth Harris' first reference to Gregory Spain's plan to commit perjury was as follows:
THE WITNESS: ... I said, "He (appellant) must have been having a hard time, there was no eye witnesses to be a witness for him."

devoid of any proof that appellant's trial counsel suborned perjured testimony, this claim must fail.

## III. PROSECUTORIAL MISCONDUCT

Appellant's next contention on appeal is that he is entitled to a new trial on the grounds of prosecutorial misconduct. In enunciating the appropriate standard of appellate review, our Supreme Court stated:

> This Court has recently defined the standard for ordering a new trial in a case where a prosecutorial statement is deemed improper. *Commonwealth v. Upsher*, 497 Pa. 621, 444 A.2d 90 (1982). There we concluded that, although a prosecutor's statement may be inappropriate, a new trial will not be granted unless it is inevitable that the prosecutor's remark prejudices the defendant to such a degree that it prevents the jury from weighing the evidence and rendering a true verdict. *Id.*, 497 Pa. at 627, 444 A.2d at 92. *See also Commonwealth v. Scarpino*, 494 Pa. 421, 431 A.2d 926 (1981) (New trial warranted when unavoidable effect of prosecutorial comment is to deprive defendant of fair trial); *Commonwealth v. Martin*, 461 Pa. 289, 336 A.2d 290 (1975); *Commonwealth v. Goosby*, 450 Pa. 609, 301 A.2d 673 (1973).

> Furthermore, "(T)he prejudicial effect of the district attorney's remarks must be evaluated in the context in which they occurred." *Commonwealth v. Smith*, 490 Pa. 380, 416 A.2d 986 (1980); *Commonwealth v. Perkins*, 473 Pa. 116, 373 A.2d 1076 (1977). However, a reversal is not an automatic formality for every intemperate or improper comment by the prosecution.

And he (Spain) says, "Well, yes, there is." I said, "Who"? He says, "Me." I said, "You weren't there at the time." He says, "Well, they don't know that."
(N.T. Vol. X at 14).
Elizabeth Harris never testified that Spain told her that he was induced by appellant's trial counsel to commit perjury at trial. On the contrary, defense counsel questioned Harris about whether she was telling the truth about her conversation with Spain.

*Commonwealth v. Maxwell,* 505 Pa. 152, 166, 477 A.2d 1309, 1316–1317, *cert. denied,* 469 U.S. 971, 105 S.Ct. 370, 83 L.Ed.2d 306 (1984).

As the trial court acknowledged, this was a lengthy and bitterly contested trial. We, consequently, must be mindful that in any adversarial proceeding, "a district attorney must have reasonable latitude in fairly presenting a case to the jury and ... he or she *must* be free to present his or her arguments with 'logical force and vigor.'" *Commonwealth v. Smith,* 490 Pa. 380, 387, 416 A.2d 986, 989 (1980) (emphasis in original) (quoting *Commonwealth v. Cronin,* 464 Pa. 138, 143, 346 A.2d 59, 62 (1975)). While the prosecutor at times should have been more discreet in phrasing his comments and questions, we find that the prosecutor's conduct during this hotly contested and dramatically litigated trial was not so prejudicial as to warrant a new trial. The prosecutor's conduct did not prevent the jury from weighing the evidence nor did it destroy the jury's ability to render a true verdict.

## A.

In this appeal, appellant alleges five points on which the prosecutor's misconduct seriously prejudiced appellant's defense. First, appellant alleges that he was prejudiced by the prosecutor's references to appellant's family and his family's alleged connection to organized crime. Appellant is the nephew of Harry "the Hunchback" Riccobene, allegedly a notorious Philadelphia organized crime figure. During an *in camera* discussion at the beginning of the trial, the trial judge granted the request by appellant's counsel for a ruling prohibiting the prosecutor from referring to the Riccobenes or to organized crime. The trial judge instructed the prosecutor not to elicit such testimony on direct examination and to caution his witnesses not to mention the subject in their testimony.

Appellant argues that in spite of the court's instruction, three prosecution witnesses volunteered the name "Riccobene" and expressed their fear of the Riccobenes (N.T. Vol.

II at 189, Vol. III at 135, Vol. X at 41); a police officer testified that certain people who wouldn't give their names had told him that appellant's neighbors were "scared to death" of appellant's family (N.T. Vol. IX at 147); a Commonwealth witness referred to appellant's mother by her maiden name, "Emma Riccobene" (N.T. Vol. III at 76–77); the prosecutor referred to Mrs. Chimenti as "Emma Riccobene" four times (N.T. Vol. III at 99; Vol. IV at 212, 213, 216); the prosecutor referred to appellant's "Uncle Harry" and to his loan sharking activities six times (N.T. Vol. VIII at 90, 92, 93, 96, 117, 248). Additionally, appellant argues that the most egregious error occurred during the prosecutor's summation where reference was made to "Uncle Harry."[4]

■ Initially, we note that appellant's defense counsel has failed to preserve most of these allegations for our review.[5] For instance, defense counsel objected to the following

**4.** Specifically, the prosecutor stated in his closing argument:
Ladies and Gentlemen, I'm not an ostrich. I don't like to stick my head in the sand and ignore certain things, and I don't think you should. He said to you, why would I do that? Why don't I just concentrate on the evidence? Well, I'm going to answer that now. I wasn't permitted to go into it at trial, but I'm going to answer it now since he raised it. Because it entered my mind that why would Salvatore Chimenti go to anybody but his uncle who may be involved, as Mr. Moldovsky put it, in other businesses, in, quote, unquote, the rackets, and that's his word, not my word. It entered my mind if this killing was all over loan sharking and he happened to borrow money off some guy because he was really down and out, he was on welfare and the whole rest of it that he gave you, it entered my mind that why wouldn't he go to Uncle Harry who is involved in all of this? And then, it also entered my mind, why would a man like Salvatore Chimenti be afraid of anybody if he had this uncle that Mr. Moldovsky said, quote, unquote, is in business elsewhere? And I don't ask you to convict Mr. Chimenti on that, but just ask yourselves those questions. Who in their right mind would threaten Salvatore Chimenti, Ladies and Gentlemen? Please, don't be ostriches.
(N.T. Vol. XI at 224–225).

**5.** Appellant alleged 16 instances of prosecutorial misconduct because of references to appellant's family and organized crime. Thirteen of these allegations have not been preserved for our review. *See* (N.T. Vol. III at 76–77, 99; Vol. IV at 212, 213, 216; Vol. VIII at 90, 92, 93, 96, 117, 248; Vol. IX at 147; Vol. X at 41).

exchange which occurred during the prosecutor's cross-examination of the accused:

Q. Now, your uncle was in the business of lending money, was he not?

A. I don't know what my uncle does.

Q. You have no idea what your uncle does?

MR. MOLDOVSKY: Objection about his uncle.

THE COURT: He answered it.

(N.T. Vol. VIII at 96). While defense counsel did object, he failed to request a mistrial or curative instruction and consequently, this issue is not preserved for our review. *See Commonwealth v. Jones,* 501 Pa. 162, 460 A.2d 739 (1983) (issue was waived on appeal where defense counsel immediately objected to prosecutor's conduct but made no request for mistrial or curative instructions). Several of appellant's allegations, however, are preserved for our review. We find that both those issues preserved for our review and those waived on appeal are meritless.

■ We find that the prosecution's references to appellant's family did not prejudice appellant to such a degree that the jury was prevented from weighing the evidence and rendering a true verdict. In fact, appellant's trial counsel opened the door to discussions about appellant's family. The very first reference to appellant's family was elicited by appellant's trial counsel. In cross-examining Mr. Harris, the following exchange occurred:

BY MR. MOLDOVSKY:

Q. Mr. Harris, did you go to the police on May the 16th?

A. No.

Q. Did you go to the police on May the 17th?

A. No.

Q. Did you go to the police on May the 18th?

A. No.

Q. Did you tell this jury that you saw Mr. Chimenti take out a gun and shoot down your friend, shoot him down with rapid fire, unload his gun into him?

A. Yes, I did.

Q. Why didn't you go to the police on May the 11th, 1982?

A. Because my family was threatened. He used his family to threaten my family; the Riccobenes; that's why.

(N.T. Vol. II at 188, 189).[6] At the time the trial judge granted the appellant's counsel's request for a ruling pro-

6. Instead of pursuing another area on cross-examination, defense counsel continued along this same line of questioning:

BY MR. MOLDOVSKY:
Q. Tell me how on May the 11th you were threatened?
A. He called my sister up.
Q. On what date, sir?
A. He called my sister up the next day.
Q. Sir, I asked you about May the 10th, May the 10th at 11:30 at night when you claim you saw him take a gun—Mr. Chimenti take a gun and shoot down your friend whom you now say had no gun; why didn't you go from that place to the nearest police station and report what you say?
A. Because I know his family and I was afraid for my life; that's why.
Q. Oh, you know his family?
A. That's right.
(N.T. Vol. II at 190, 191).
Additionally, during a colloquy, the court ruled that there was no prosecutorial misconduct and that defense counsel was responsible for eliciting the name Riccobene:

MR. MOLDOVSKY: May it please the court, what comes out on cross, this can be, you might say, calculated lethargy on the D.A.'s part not to inquire of it on direct and to allow it to lay there.

Your Honor, when a person is involved in a shooting as a witness, right there with the victim, according to Harris, that's his testimony, there must be some reason that nineteen days go by before he goes to the police.

THE COURT: Don't you think the mere fact that nineteen days went by is a very important fact for the jury, without giving a reason?

You should just leave it alone. You are the one who went in and probed.

MR. MOLDOVSKY: I am entitled to inquire why he waited so long. But, Your Honor, I had asked to admonish—

THE COURT: What is he supposed to do? Suppose he really, truly was afraid? Is he supposed to commit perjury?

MR. DiDONATO: That's what I warned you about.

THE COURT: You asked that question, Joel, and you were doing beautifully; you were saying, "You didn't go on May the 11th; you didn't go on May the 12th; it was very effective with the jury. I thought you were going to go through the whole nineteen, and all of

hibiting the prosecutor from referring to the Riccobenes or to organized crime, the trial court also warned defense counsel (Mr. Moldovsky):

> Now, if on cross-examination, as a result of your questioning, something comes forward, that is no one's fault because the case law is equally clear that when, on cross-examination, you bring out issues which on direct might be grounds for a mistrial, there is no longer any availability of that request.

(N.T. Vol. II at 2, 3). Additionally, appellant is the nephew of a newsworthy, allegedly organized crime figure. As the trial court explained:

> The indisputable and immutable fact is that the defendant is his uncle's nephew. Most of his witnesses were family members. It is impossible for the prosecutor to blindfold himself to that reality. Given extremely hard issues in the trial the prosecutor did what he had to do: refute the defense portrait of Chimenti as a struggling, pitiful, Horatio Alger-type to show that he killed the victim in cold blood.

(Post-verdict ruling at 5).

We will address appellant's allegation regarding the prosecutor's closing argument separately because appellant alleges that this was the prosecutor's most egregious error since his comments were specifically directed to the jury. Appellant argues that the prosecutor's remarks in his closing argument connected appellant to an organized crime figure, appellant's Uncle Harry. Appellant additionally maintains that because of that connection, a loan from Harris was unnecessary and no one would threaten appellant as he claimed Tucker had done. *See supra* note 2. We find that the prosecutor's remarks were a fair response to defense counsel's allegations in his closing argument that the prosecutor prejudiced appellant.[7] *See Commonwealth v. D'Ambro*, 500 Pa. 303, 456 A.2d 140 (1983) (prosecutor

a sudden, you stopped and said, "Why didn't you go"; then he says, "I was afraid of Riccobene". You asked for it.
(N.T. Vol. IV at 15–17).

7. In his closing argument, defense counsel stated:

can respond to remarks made by defense counsel in his closing). Additionally, the trial judge gave a cautionary instruction in her charge to the jury that the attorneys' "speeches are not evidence."[8] As this Court stated in *Commonwealth v. Williams:*

Our system of jurisprudence not only relies but rests upon the notion that the scales of justice are evenly

Of all the sad words of tongue-in-pen the saddest are these, what might have been. What might have been if a jury tried the case on the wrong basis; they tried the case not so much on the actual occurrence, but on maybe who Mr. Chimenti's relatives were or are

. . .

I think, in my very closing question of Mr. Harris, I got all upset there because I smelled this attempt to prejudice and inflame the jury because of some type of relative who might or might not be infamous, who might or might not be in the rackets, but who certainly had nothing whatsoever to do with this case, but I saw such an outreaching to pull that name into something that it wasn't in. . . .

Or were they just questions asked to inflame and prejudice you and make you feel hostile towards Mr. Chimenti, meant to enrage me, meant to force me to object so that the jury would be so sure that I was hiding something relevant to the trial rather than trying to keep something out of the trial that had nothing to do with the trial whatsoever? So this is the type of question you might ask. . . .

I want you to hear it all, not in innuendo, not implication, not prejudice, not inflammation—whether his uncle is the Pope or his uncle is in the rackets, whether his uncle is President Judge of this Court or the Supreme Court, what does that have to do with anything? If his uncle were the Pope and you felt that he had gunned down ten people in coldblood, would you hesitate to convict him of murder? And will it make any difference if his uncle or one of his uncles is allegedly involved in certain rackets? Are we going to have the sins of the fathers visited on the sons?

(N.T. Vol. XI at 121, 122, 124, 125, 139, 140).

8. The trial judge instructed the jury that:

Both Mr. DiDonato and Mr. Moldovsky are very eloquent lawyers. They have different styles, but they are equally eloquent, and they both gave you what I thought were really marvelous closing addresses. Their speeches are not evidence. Just because Mr. Moldovsky or Mr. DiDonato said something was in the case does not mean that you have to accept that. It is your recollection that governs, but their speeches are useful as guides to the evidence, so you certainly can consider them as guides to the extent that they are supported by the evidence and insofar as they help you to apply your own reason and your own common sense. But you don't have to accept the arguments of either one. Your vote should not depend on an endorsement of either side's closing argument.

(N.T. Vol. XII at 21–22).

balanced and each party, not only the defendant but also the Commonwealth, must be afforded an equal opportunity to tip the scales. It, therefore, follows, that the Commonwealth is entitled to a full measure of oral advocacy and the prosecutor has not only the privilege but the duty to exert his skills as an advocate in such manner as he deems the most likely to be persuasive. There is no sound reason why counsel for the Commonwealth should be expected to show any less fervor than counsel for the defendant during any portion of the trial, including the closing remarks, provided, of course, the statements do not fall afoul of the ABA Prosecution Standards. *The trial court is the best monitor of the propriety of the remarks of counsel for the Commonwealth during argument and the appellate courts must be more than hesitant to disturb a determination of the trial court regarding propriety since the quiet, studied solemnity of the appellate court is a world apart from the charged atmosphere of the trial courtroom.*

295 Pa.Super. 369, 441 A.2d 1277 (1982) (emphasis added). Similarly, as the trial court acknowledged, the prosecutor's remarks in the instant case were merely appropriate trial advocacy.[9]

9. At the end of the prosecutor's closing argument, defense counsel moved for a mistrial "because the District Attorney brought up the name of Harry Riccobene." (N.T. Vol. XI at 317). *See Commonwealth v. Williams,* 500 Pa. 226, 455 A.2d 632 (1983) (objection may be made at the completion of the closing argument). The trial judge did not find the prosecutor's reference to Harry Riccobene to be prejudicial:

THE COURT: I know, but there was an inference throughout the trial that Mr. DiDonato was trying to blacken the defendant's character through the rues of guilt by association, and you brought that up in your closing. You talked about communists, and the McCarthy period, et cetera. So he had to answer that by saying the only reason he was bringing up this name was to show the defendant had relatives who were affluent and people who had other interests. I mean, he was very careful.

(N.T. Vol. XI at 318–319).

**B.**

■ Second, appellant claims that he was prejudiced when the prosecutor stated that he had tapes which proved that a conversation occurred between appellant and his Uncle Harry in which appellant told his uncle that he had $150,000 and wanted to run a bookie operation (N.T. Vol. VIII at 93). We find that this issue was not preserved for our review since appellant's trial counsel did not request a mistrial or curative instruction. *See Jones,* 501 Pa. 162, 460 A.2d 739 (1983). Even if this issue was preserved for our review, we would find appellant's contention to be meritless. As the trial court aptly explained:

> In his efforts to attack the defendant's credibility, the Assistant District Attorney questioned him regarding his alleged lack of funds. The defendant denied having had a conversation with his uncle on November 16, 1977. During the conversation, the Assistant District Attorney asserted, the defendant had said that he had large sums of money. This conversation had been recorded by the Federal Bureau of Investigation. Therefore, when the Court asked the prosecution how it was going to prove the conversation, Mr. DiDonato replied, "I have tapes."
>
> The Court ruled that this was a collateral issue which could not be used to impeach the defendant. The Assistant District Attorney then continued his cross-examination of the defendant without further reference to the tapes. Clearly, this evidence could not have resulted in the kind of prejudice which requires the granting of a new trial. The Court, furthermore, warned the jury (in the Court's charge to the jury) to disregard any comment or statement and to consider only evidence introduced competently at trial.

(Trial court opinion at 14).

■ Appellant additionally argues that he was prejudiced when appellant's counsel later requested a tape of a telephone message from Elizabeth Harris to Gregory Spain, and the prosecutor responded: "What tape do you want? Which tape? The tape from 1977?" (N.T. Vol. X at 40).

This issue is also waived on appeal since appellant's trial counsel failed to make an objection. *See Commonwealth ex rel. Sprangle v. Maroney,* 423 Pa. 589, 225 A.2d 236 (1967) (failure of defendant's counsel to object to improper remark by prosecutor waives defendant's rights in the matter). Even if this issue was preserved for our review, we would find appellant's contention to be meritless. Our review of the record reveals that there was no indication as to which tape defense counsel was requesting. When defense counsel requested "this tape," he was no longer questioning Miss Harris about the tape recorded telephone message. In fact, defense counsel's questioning of Miss Harris about the tape appears in the record a full twelve pages before defense counsel's request for the tape. The court was also confused and asked "which tapes" defense counsel was making reference to. (N.T. Vol. X at 40). We, consequently, find that appellant was not prejudiced by the prosecutor's statement.

■ Appellant further argues that he was prejudiced by a comment made by the prosecutor when the prosecutor was again challenging appellant's credibility. After the court ruled that it would not allow the prosecutor to ask questions on this topic because it was highly prejudicial, the prosecutor responded: "Usually it's prejudicial when somebody lies." (N.T. Vol. VIII at 118). We find that this issue is waived on appeal because defense counsel failed to make an objection. *See Commonwealth ex rel. Sprangle v. Maroney,* 423 Pa. 589, 225 A.2d 236 (1967). Even if this issue was preserved for our review, we would find appellant's contention to be meritless. The trial court *sua sponte* instructed the jury to disregard the prosecutor's remark. *Commonwealth v. Richardson,* 496 Pa. 521, 437 A.2d 1162 (1981) (potential prejudice could be cured by cautionary instructions from the judge). As we previously stated, a new trial will not be granted "for every intemperate or improper comment by the prosecution." *Maxwell,* 505 Pa. at 166, 477 A.2d at 1317.

## C.

Third, appellant argues that he was prejudiced by the prosecution's reference to appellant's failure to volunteer to take a polygraph examination on his current charges. During cross-examination, the prosecutor asked appellant whether he had threatened Elizabeth Harris in Atlantic City. (N.T. Vol. VIII at 238). Appellant denied this accusation and the following exchange later occurred:

Q. Okay. Mr. Moldovsky asked you if we tried to arrest you. Didn't we file a petition to have your bail revoked so we could put you back in jail so you couldn't threaten anybody?

A. Right, and I also went to the D.A. and offered to take a lie detector test and the D.A. dropped it when he—

Q. The D.A. didn't give you a lie detector test? We wouldn't give you a lie detector test?

A. That's right.

Q. Did we ask you for a lie detector test on this crime you're saying or—

THE COURT: Just a minute. Let him answer.

THE WITNESS: No, on the threat down the shore.

BY MR. DiDONATO:

Q. Only on the threats?

A. On the threat down the shore.

MR. DiDONATO: I thought he meant he wanted to take a lie detector test about this case, oh.

(N.T. Vol. VIII at 249–250).

■ Once again, we find that appellant has failed to preserve his claim for our review since defense counsel failed to object to the prosecutor's statement. *See Maroney*, 423 Pa. 589, 225 A.2d 236 (1967). Even if this issue was preserved for our review, we would find that the prosecutor's remark cannot be said to have had so prejudicial an effect as to prevent the jury from weighing the evidence and rendering a true verdict. During cross-examination, without being questioned about a polygraph examination by the prosecutor, appellant readily volunteered that

he had offered to take a polygraph examination. Also, the prosecutor's reference to a "lie detector test on this crime" was merely in passing and was an attempt by the prosecutor to ascertain what lie detector test appellant was referring to.

### D.

Fourth, appellant alleges that he was prejudiced by the prosecutor's portrayal of appellant as a drug dealer. Appellant objects to the prosecutor's questioning of witnesses: asking a witness if he knew "anything about the defendant selling drugs?" (N.T. Vol. IV at 136); asking another witness if he knew "if he (appellant) was involved in smuggling drugs with Bobby Harris?" (N.T. Vol. V at 166); and asking a third witness: "He (appellant) doesn't use drugs or sell drugs, does he?" (N.T. Vol. XI at 48).

We find that all three of appellant's allegations have been waived on appeal. The first two allegations are not preserved for our review since appellant's counsel failed to make a request for mistrial or curative instructions. *See Commonwealth v. Jones*, 501 Pa. 162, 460 A.2d 739 (1983). Appellant's third allegation is also waived since appellant's counsel did not even object when the prosecutor asked the question. *See id.* Even if preserved for our review, however, appellant's claim of prosecutorial misconduct is meritless. We find that it was appellant who introduced a drug motive into this case. Appellant argued that he borrowed $30,000 from Harris, a drug dealer. Appellant's counsel questioned numerous witnesses about whether Harris and Tucker were involved in a drug smuggling ring. (*See, e.g.,* N.T. Vol. II at 195). Since defense counsel opened the door by making drug smuggling an issue in this case, appellant cannot now complain that the prosecutor asked these witnesses if appellant was also involved with Harris and Tucker in these activities. During an *in camera* conference, the trial judge agreed with the prosecutor that "it is important

to know how these two people (appellant and Harris) met." (N.T. Vol. VI at 21).[10]

Additionally, the prosecutor's questions in this area were very carefully phrased: "Do you know anything about the defendant selling drugs?" (N.T. Vol. IV at 136); "Do you know if he was involved in smuggling drugs with Bobby Harris?" (N.T. Vol. V at 166); "He (appellant) doesn't use drugs or sell drugs, does he?" (N.T. Vol. XI at 48). We, consequently, find that the prosecutor's questions on this topic did not prejudice appellant to such a degree that the jury was prevented from weighing the evidence and rendering a true verdict.

## E.

Fifth, appellant argues that the prosecutor made other improper comments during the trial that prejudiced appellant: the prosecutor opined that he did not think a witness was "telling everything he knows" (N.T. Vol. IV at 299); he told another witness that he "wouldn't try to imply anything ... with a witness like you" (N.T. Vol. V at 134); the prosecutor said that he "would love to put in some things" (N.T. Vol. X at 40); the prosecutor also said "let's tell the jury everything" (N.T. Vol. VII at 85); in his closing argument, the prosecutor told the jury that the failure of the police to check the .38 caliber revolver for fingerprints was inconsequential because "in eight years (as a prosecutor) I have never had a case with fingerprints ... it just doesn't happen" (N.T. Vol. XI at 233); he explained away an inconsistency between Robert Harris' testimony at trial and

10. The following exchange occurred during the *in camera* conference:
   MR. DiDONATO: ...
   As to his first motion that I am asking people whether or not the defendant sells drugs, yes, and I intend to ask the defendant that. Mr. Moldovsky has painted Mr. Harris, the eyewitness, as a major cocaine dealer smuggling drugs from Florida. He says that his client borrowed $30,000 off this major drug dealer. I want to know what's going on! Are there any drug dealings between these two guys?
   THE COURT: I also think it is important to know how these two people met.
   (N.T. Vol. VI at 21).

his testimony at the preliminary hearing by saying that "(e)ven the Judge at the preliminary hearing" thought that defense counsel had treated Harris unfairly (N.T. Vol. II at 218); and the prosecutor asked a witness, without any factual foundation, whether Mrs. Chimenti had sought the witness' assistance in disposing of two guns after the shooting (N.T. Vol. VII at 75).

Once again, all of appellant's allegations have been waived on appeal. Defense counsel failed to object to five of the prosecutor's comments (N.T. Vol. II at 218; Vol. V at 134; Vol. VII at 85; Vol. X at 40; Vol. XI at 233) and failed to request a mistrial or curative instruction with regard to the other two comments made by the prosecutor (N.T. Vol. IV at 299; Vol. VII at 75). *See Jones*, 501 Pa. 162, 460 A.2d 739 (1983).

Even if preserved for our review, however, we would find appellant's claims to be meritless. In reference to the first four comments appellant is now challenging, we find that each was not improper when considering the context in which it occurred. *See Maxwell*, 505 Pa. 152, 477 A.2d 1309 (1984) (the prejudicial effect of the district attorney's remarks must be evaluated in the context in which they occurred). The following exchange occurred when the prosecutor was cross-examining appellant's brother:

(BY MR. DiDONATO):

Q. You remember that, don't you.

THE COURT: *This witness is being very candid. I think he is telling everything that he knows and it is a very legitimate question.*

MR. DiDONATO: I don't think he is telling everything he knows, Judge.

MR. MOLDOVSKY: Objection.

THE COURT: He is answering your questions.

MR. DiDONATO: You can't say he is telling everything he knows.

THE COURT: Don't tell me what I can say or I cannot say.

MR. DiDONATO: That was for this jury to decide, I thought.

THE COURT: Go on with your question.

(N.T. Vol. IV at 299) (emphasis added).

■ The prosecutor's comment in response to the trial court's statement that the witness was being candid was not improper in the context in which it occurred. Later, during cross-examination of the same witness, the following exchange occurred:

(BY MR. DiDONATO):

Q. You, of course, never threw this weapon down to Mr. Tucker's body, did you, Mario?

A. No, sir, I never seen that weapon in my life.

Q. You must have saw the barrel of it, you said?

A. Yeah, the tip of it.

Q. That's just a slip of the tongue, isn't it? Isn't it?

THE COURT: Mr. DiDonato.

THE WITNESS: No, Sir.

MR. DiDONATO: I have no further questions. I wouldn't try to imply anything, Mr. Chimenti—

THE COURT: Mr. Chimenti—

MR. DiDONATO: —With a witness like you, no way.

MR. MOLDOVSKY: He said he has no further questions.

THE COURT: I ask the jury to disregard Mr. DiDonato's last statement "with a witness like you," whatever it was that he said. It is very improper.

(N.T. Vol. V at 134–135).

■ The witness had just testified *inter alia* that he was a drug addict and was recently incarcerated. Where the witness characterized himself in this manner, the prosecutor's comment cannot be deemed so prejudicial as to require a new trial. Moreover, the trial court's *sua sponte* curative instruction cured any possible prejudice.

■ Also, the prosecutor's remark that he would "love to put in some things" was a fair response to defense

counsel's attack on the prosecutor's integrity.[11]  *See* (N.T. Vol. X at 39-40).  Similarly, the prosecutor's comment, "tell the jury everything" related to whether a motion should be argued at sidebar or in front of the jury and the comment was also made in response to an attack by defense counsel on the prosecutor in the presence of the jury.[12]

■■■■  The next remark by the prosecutor that appellant challenges is the prosecutor's discussion in his closing argument of the failure of the police to check the .38 caliber gun for fingerprints.  We find that the statements in the prosecutor's closing argument were a fair response to defense counsel's suggestion during closing that the police purposely did not dust the gun for fingerprints.[13]  *See D'Ambro,*

11. During defense counsel's cross-examination of Robert Harris, the following occurred:
(BY MR. MOLDOVSKY):
Q.  Did he tell you that Mr. DiDonato is the D.A.'s ace;  when they have an impossible case, they send him in because he screams and he yells and he prejudices and he puts in inadmissible things and he gets the trial—
MR. DiDONATO:  I wish I could put in some things.
THE COURT:  Not in this room you're not.
MR. DiDONATO:  I would love to put in some things.
(N.T. Vol. X at 39-40).

12. In discussing the prosecutor's possession of a police interview of a witness, a copy of which the defense wanted to obtain, the following exchange occurred:
MR. MOLDOVSKY:  May it please the Court, surreptitiously, and in violation of the rules—
THE COURT:  Without the adverbs.
MR. DiDONATO:  If we want to do this in front of the jury, let's tell the jury everything.
MR. MOLDOVSKY:  I'm all for their knowing the truth.
MR. DiDONATO:  Then let's do this at sidebar then.
THE COURT:  Calm down.
What is your motion?
MR. MOLDOVSKY:  My motion, Your Honor, is that I be given a copy of that.
THE COURT:  You have it.
(N.T. Vol. VII at 84-85).

13. In discussing the failure of the police to dust the gun for fingerprints, defense counsel stated in his closing argument:
Ladies and Gentlemen, Police are not disinterested witnesses. Thank God we've got them.  I don't think we could have society if we didn't have someone to keep the law and order.  But when you

500 Pa. 303, 456 A.2d 140 (1983) (prosecutor can respond to remarks made by defense counsel in his closing). Appellant also challenges the comment the prosecutor made in response to defense counsel's method of cross-examining Robert Harris about his prior testimony at the preliminary hearing.[14] While it would have been more appropriate for the prosecutor to deal with this matter during his redirect examination of the witness, we do not find the prosecutor's comment to be so prejudicial as to require a new trial.

put a lot of effort into your work, you want to see a certain product come out. With whom did these detectives work? They certainly don't go at my beckon call and assist me. They're not supposed to. They are there to assist the District Attorney. I am not saying that any policeman or detective consciously and intentionally told you an outright lie; I'm not saying that. These men work hard and they take chances and we owe them a lot, but when you have an interest, if you want to see a conviction for something, at least, come out of a case, might you not tend to be a little bias, to slip your testimony one way or another?
(N.T. Vol. XI at 210–211).

14. The prosecutor's comment occurred in the following context:
(BY MR. MOLDOVSKY):
Q. Do you recall being asked at the preliminary hearing over and over and over, "Was the jacket wrapped around his hand"; and over and over and over replying, "I don't know; I don't know; I don't remember; I'm not sure"?
A. Right.
Q. Well, how is it again, a year later, you are going to tell this jury that his jacket was over his shoulder—
A. That's were it was at.
Q. —excuse me, I'm not finished—when six weeks afterwards, you took an oath to tell the truth and you were asked repeatedly, "Was it around his hand? I'm not sure. Which hand? I'm not sure; I don't remember. I can't say."
    MR. DiDONATO: Judge, there is a proper way; this is Mr. Moldovsky's characterization—
    THE COURT: I think this is proper and I am going to allow the question, Mr. DiDonato.
    Please answer it.
    THE WITNESS: Okay.
BY MR. MOLDOVSKY:
Q. Please.
A. Now, at that time, when you were asking, you kept trying—you kept trying to put words in my mouth.
    MR. DiDONATO: Judge, that's the answer. That's exactly what happened here. Even the Judge at the preliminary hearing thought that was happening.
(N.T. Vol. II at 217–218).

■ Appellant's final contention of prosecutorial misconduct is that the prosecutor, without any factual foundation, asked a witness whether Mrs. Chimenti had sought the witness' assistance in disposing of two guns after the shooting.[15] Any possible prejudice to appellant that may have occurred as a result of the prosecutor's remarks, however, was cured when the trial court granted defense counsel's request to strike the questions (N.T. Vol. VII at 75) and by the court's cautionary instruction to the jury to disregard all statements that were made about "Mrs. Chimenti's trenchcoat, guns, et cetera." (N.T. Vol. VII at 80).

## IV. SUFFICIENCY OF THE EVIDENCE

Appellant's final contention on appeal is that the evidence was insufficient to support his first-degree murder conviction. The well-established standard for reviewing a sufficiency claim on appeal from a conviction was stated recently by our Supreme Court as:

> (W)hether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable

15. During cross-examination of a witness, the prosecutor stated:
(BY MR. DiDONATO):
Q. Do you remember Mrs. Chimenti coming into your house that night?
A. Yes.
Q. She came in right after the shooting, did she not?
A. I don't know. Maybe a little while after.
Q. You remember Mrs. Chimenti wearing a trenchcoat?
A. Yes.
Q. It was a hot night, you said, though?
A. Yes.
Q. Do you remember any guns in Mrs. Chimenti's trenchcoat?
A. No.
Q. She didn't have, of course, the weapons that Sal had had earlier; correct—
A. I never seen them.
Q. —you didn't see a .25 caliber automatic either, did you?
A. A .25 automatic.
Q. Did you see Mrs. Chimenti with two guns that night?
A. No.
Q. Did she come over to your house and say, 'I have to get rid of these guns; help me hide them'?
(N.T. Vol. VII at 74–75).

inferences favorable to the Commonwealth, there is sufficient evidence to find every element of the crime beyond a reasonable doubt.... The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence ... Moreover, in applying the above test, the entire trial record must be evaluated and all evidence actually received must be considered ... Finally, the trier of fact, while passing upon the credibility of witnesses and the weight to be afforded the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Griscavage,* 512 Pa. 540, 543, 517 A.2d 1256, 1257 (1986) (quoting *Commonwealth v. Harper,* 485 Pa. 572, 576–577, 403 A.2d 536, 538–539 (1979) (citations omitted)). After thoroughly examining the evidence presented, and taking from it all reasonable inferences favorable to the Commonwealth and resolving all conflicting evidence in favor of the Commonwealth, we find that appellant's claim of insufficient evidence must fail.

A person is guilty of criminal homicide if he intentionally, knowingly, recklessly, or negligently causes the death of another. 18 Pa.C.S.A. Sec. 2501(a). A criminal homicide becomes a murder of the first degree when it is committed by an intentional killing. 18 Pa.C.S.A. Sec. 2502(a). We find the evidence presented at trial to be more than sufficient to sustain the jury's verdict of first-degree murder.

The Commonwealth's evidence established that a few days before the murder, appellant and Andrew Tucker, the decedent, had a verbal argument on South Sheridan Street in Philadelphia where appellant's mother lived and where appellant frequently stayed. That same day, appellant called Robert Harris, and asked him to arrange a meeting between appellant and Tucker. Harris arranged the meeting and on the night of the shooting, appellant armed himself for this confrontation with a fully loaded gun. Appellant told Harris that if Tucker "starts any trouble in front of my mother's house, I'll blow him away." (N.T. Vol.

II at 164). Appellant then asked his brother if he had his "piece" and checked to make sure his wife was inside the house. When Tucker walked up the street, appellant prepared for the confrontation by going to the third step of the porch. Tucker stopped in front of the steps and appellant continued the verbal argument and pointed his finger in Tucker's face. When Tucker pushed appellant's finger away, appellant drew his gun and fired all seven bullets from his powerful .38 caliber semi-automatic gun at Tucker. Appellant had also loaded his gun with aluminum-jacketed bullets which cause greater expansion on impact than ordinary bullets. The evidence showed that appellant continued to fire at Tucker even as he attempted to run, with bullets entering the front, back, and left side of the deceased. Four shots struck Tucker in the chest. According to the Commonwealth's witnesses, Tucker was unarmed.

It is well-settled that the use of a gun on a vital part of the deceased's body raises the presumption that the defendant shot with the intent to kill the deceased, *Commonwealth v. Ewing*, 439 Pa. 88, 264 A.2d 661 (1970), and that the period of premeditation necessary to form the specific intent to kill may be very brief. *Commonwealth v. Thornton*, 494 Pa. 260, 431 A.2d 248 (1981). The Commonwealth's evidence proved beyond a reasonable doubt that appellant intentionally murdered Tucker. As fact finders, the jury had the right not to believe appellant's version of the murder and his claim of self-defense.

## V. CONCLUSION

For the foregoing reasons, we find that the issues raised on this appeal are meritless. Accordingly, we affirm the trial court's judgment of sentence.