140

613 A.2d 1215

**COMMONWEALTH of Pennsylvania**

v.

**Craig MURPHY, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 23, 1992.

Filed Aug. 6, 1992.

142

Jeffrey M. Kolanzky, Philadelphia, for appellant.

Kathy Echternach, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before McEWEN, BECK and KELLY, JJ.

BECK, Judge:

In this case, inter alia, we analyze and apply the standard relevant to consolidation of charges where one of the charges is corrupt organizations and the other is murder.

Appellant Craig Murphy raises multiple challenges to his conviction for the execution-style slaying of drug-trafficking rivals Noble Green and William Bud Johnson and related

offenses.[1] We have carefully reviewed the record of appellant's jury trial and have considered the merits of each of appellant's claims. We reject them all and affirm the judgment of sentence.

In order to adequately assess appellant's challenges on appeal, it is necessary to review in full the evidence upon which the convictions are based. Three men were tried together for the murder of Noble Green and the eventually fatal assault on William Bud Johnson. They were appellant Craig Murphy, and co-defendants Rodney Wells and Ford Howard. Murphy, Wells and Howard were confederates in a drug-dealing association called "the Family" which functioned in the early 1980's. Through the operations of this organization, hundreds of thousands of dollars worth of cocaine were distributed in Philadelphia during the relevant time period. According to Commonwealth witnesses, Craig Murphy was the leader of the group and the one from whom the others took their orders.

The extent of the "Family's" drug trafficking and the control over it exercised by appellant Murphy were attested to by several witnesses. For instance, appellant's former girlfriend, with whom he lived between 1979 and 1982 or 1983, stated that appellant often had large supplies of cocaine in the house, that she accompanied him on forays to secure drugs and that appellant made his living from the drug trade. Another witness, Sonya Mackie, testified to appellant's role in selling cocaine. She identified numerous individuals who sold drugs for Murphy, including her late husband.[2]

1. Following the trial in the instant case, the surviving victim, William Bud Johnson, died of the injuries sustained in this assault. Appellant pled guilty to voluntary manslaughter and was sentenced consecutively to other sentences imposed in this case. No sentence was imposed for the original aggravated assault charge.

2. Ms. Mackie did not testify, however, that her husband had been killed in another drug gang assassination by the same three individuals presently on trial. The prosecutor's questions were circumscribed and carefully framed to keep the jury from becoming aware that Murphy had already been convicted of first degree murder for the September, 1983 death of James "Muscles" Reynolds, Mackie's husband. *See Commonwealth v. Howard*, 375 Pa.Super. 43, 543 A.2d 1169 (1988),

Chiefly, evidence about the drug dealing business in which appellant was engaged came from Charles Harris, a former associate of the appellant. Harris' testimony was that he, Murphy, Wells and Howard formed the "Family" at the beginning of 1980. The hierarchy, as noted above, was that Murphy was the boss of the organization, while Wells and Howard acted as his subordinates. According to Harris, the group engaged in large scale narcotics transactions, with bulk purchases of cocaine personally transacted by Harris with appellant ranging from $10,000 to $100,000 each. The group maintained an office where they would plot strategy, devise ways to "launder" the drug profits, discuss plans for expanding the trade, etc. The "Family" met every day either in Harris' office or home, or at gambling establishments. Harris estimated that during the time period in question, when the group's drug business was at its height, appellant himself would make between $75,000 and $100,000 a week. Approximately twenty to twenty-five people worked for appellant selling drugs. In addition, Harris specifically noted that his gang was planning to meet with certain individuals in South Philadelphia who were members of the so-called "20th and Carpenter" gang. Harris testified that such a meeting actually occurred but that he was not privy to the contents of the discussion.

Apparently one of the functions of the "Family" was the attempted elimination of anyone who interfered with its dominance in or control over its portion of the cocaine trade. Thus, one witness, Lisa Waters, testified that one night in January, 1983, appellant and another individual named Barry Jones accompanied her to a park after having accused her of being a "snitch". While appellant "hugged" Waters, Jones shot her several times. After the shots were fired, appellant dropped her and ran. Remarkably Waters survived. Waters testified that later someone who said he spoke with appellant every day offered her $10,000 not to testify regarding the assault.

*appeal denied,* 522 Pa. 573, 559 A.2d 35 (1989). The fatal assault on Green and Johnson in the instant case had occurred on July 16, 1983. Arrests were not immediately forthcoming in either murder.

The Commonwealth's theory regarding the attack on Noble Green and William Bud Johnson was that it was part of the "Family's" practice of liquidating suspected impediments to its lucrative drug operations. Green and Johnson, as acknowledged members of the "20th and Carpenter" gang, were allegedly trying to interfere with the "Family's" cocaine trade in South Philadelphia.[3] The testimony revealed that one of co-defendant Wells' drug dealers in South Philadelphia, Kerry Harrison, was approached by Johnson who demanded money from Harrison in exchange for "permitting" him to do business in the area. Word of this perceived extortion reached the "Family".

On July 16, 1983, appellant, Wells and Howard drove to 23rd and Pierce Streets. The next segment of the episode was described at trial by William Bud Johnson, who testified along with Florence Daniels at trial. Although Johnson was able to testify at trial, he subsequently died from the wounds. Noble Green was in a car with co-defendant Rodney Wells and motioned Johnson over to the car. Johnson had been walking down the street with his fiance, the now-deceased Theresa Teagle. Johnson got into the back seat at the request of Green. Green told Johnson that "these guys [referring to Wells] say we're harassing them". Immediately, Johnson's instincts told him to try to exit the car. Before he could escape however, Wells held up his hand, signalled to the others and they started shooting. The "others" had been stationed on the corners surrounding the car. Noble Green died that night and Johnson never recovered.

Florence Daniels, a key Commonwealth witness, was also in the vicinity of the assault. She watched the men station themselves on the corners. One of the men approached her, asking about Johnson. Almost immediately thereafter, Johnson came by with Teagle and Daniels overheard one of the men tell Johnson to get into the car. She saw Johnson get into the car and then heard the shooting start. Florence

3. At trial, Johnson himself testified that he and Green were members of the rival "20th and Carpenter" gang.

Daniels positively identified Murphy and Howard as two of the men she saw on the corner that day.

Daniels also identified another party who was involved in the Green/Johnson shooting—Barry Jones. Jones, a very large man, was identified by Daniels from photographs. Jones was called as a Commonwealth witness. Although Jones was called as a result of an incriminating statement he had given to the prosecutor, as soon as he assumed the witness stand he recanted the statements in which he had outlined his and appellant's participation in the shooting.[4] The prosecutor claimed surprise and was permitted to cross-examine Jones in order to impeach him with the prior inconsistent statement.

Theresa Teagle was William Bud Johnson's fiance. She was with him on the night of the shooting. Teagle told a police detective that she could identify the assailants. Teagle was summoned to a preliminary hearing which was continued at defense request in order to hold a line-up. Teagle was announced as one of the witnesses who would attend the line-up and who was able to identify the assailants. Teagle was at the preliminary hearing with Daniels. At that time Teagle wore her hair in a style known as "Jerry curls". Daniels received an ominous phone call before the line-up was held in which the caller told Daniels that "the one with the Jerry curls" would be dead for "telling". A line-up was scheduled but Theresa Teagle was killed before she could attend it.

Police witnesses also testified to several events tending to corroborate appellant's involvement with drugs and guns. For instance, the police testified to a surveillance and subsequent search of a house used for drug trafficking by a man named Howard Willis, who was repeatedly identified at trial as one of appellant's drug couriers. Drugs and drug paraphernalia were seized.

In addition, the police testified to an incident during which appellant, the two co-defendants and others were apprehended brandishing guns. The weapon seized from appellant was a

---

4. We note that Jones, along with appellant, was identified as the assailant in the Lisa Waters assault.

.357 colt python. Other weapons were also recovered from the same location. The Commonwealth's ballistics expert stated that the bullets recovered from the car and the victims' bodies were .38/.357 lead projectiles but he could not affirmatively match them to the guns recovered from the defendants.

The defendant did not testify but instead presented his alibi defense through the testimony of his mother, sister and son.

The jury found appellant guilty of criminal conspiracy, possession of instruments of crime, corrupt organizations, aggravated assault, and third degree murder. Post-verdict motions were heard and denied. A mandatory life term of imprisonment was imposed for third degree murder as a result of appellant's previous conviction for first degree murder.

Appellant seeks relief on several grounds. He argues that the verdict for third degree murder was against the weight of the evidence. Appellant also challenges the sufficiency of the evidence on the corrupt organizations conviction. Further, appellant alleges that the trial court abused its discretion in refusing to sever the charge of corrupt organizations from the rest of the charges. Appellant also claims that the trial court erred in admitting certain evidence of appellant's drug trafficking at trial because he alleges that the probative value was outweighed by the prejudicial impact. The prosecutor's closing argument to the jury is also challenged as are the trial court's jury instructions. Finally, appellant argues that he is entitled to a new trial because he allegedly received inadequate notice of the predicate offenses which supported the corrupt organizations charge.

We first address appellant's challenges to the weight and sufficiency of the evidence in the case. Initially, we note that this court's authority to review claims of this nature was recently confirmed in *Commonwealth v. Murray,* 408 Pa.Super. 435, 597 A.2d 111 (1991) (en banc), *appeal denied,* 529 Pa. 668, 605 A.2d 333 (1992). In *Murray,* the en banc court stated: "The law in this Commonwealth has long been that a new trial may be ordered 'on the ground that the verdict is against the weight of the evidence, when the jury's verdict is

so contrary to the evidence as to shock one's sense of justice, and the award of a new trial is imperative so that right may be given another opportunity to prevail.' " *Commonwealth v. Murray*, 408 Pa.Super. at 439, 597 A.2d at 113 (citation omitted). In light of this standard, appellant's claim cannot prevail.

■ Appellant argues that the verdict for third degree murder is against the weight of the evidence because the only witness actually placing appellant at the scene of the murder, Florence Daniels, gave inherently unreliable testimony. Appellant's argument that a verdict of guilt shocks the conscience if based on Daniels' identification testimony is grounded primarily on the fact that Daniels failed to identify him at a line-up or preliminary hearing. The trial court rejected this claim, noting that Daniels remained credible despite extensive "grilling" by defense counsel. Daniels persuasively explained her failure to identify appellant at the line-up or preliminary hearing. She had received a threatening call prior to her appearance and she was frightened.[5] Theresa Teagle, along with whom Daniels had been identified as a witness for the Commonwealth, was dead, having been killed before the line-up could be held.[6]

Appellant concedes that the presence of intimidation might explain the failure to identify appellant "under normal conditions" but he also argues that Daniels' identification is fatally undermined by the circumstances under which she saw appellant. In particular, appellant notes that Daniels described the scene of the murder as "pitch black" and also conceded that she had consumed some beer and smoked "reefer" before she witnessed the shooting. Appellant cannot prevail on these arguments. Daniels was vigorously cross-examined by counsel regarding the visibility, her certainty with respect to

5. In fact, the evidence was that the threatening phone call actually presaged the death of Theresa Teagle. In the call to Daniels, the caller stated that the girl with the "Jerry curls" (i.e. Teagle) was going to be dead for "telling". Clearly, the threat was not an idle one.

6. Through testimony elicited from the police the jury was informed that an individual named James Churchill was tried for Teagle's murder and found not guilty.

appellant's participation and her ability to accurately perceive events despite her slight degree of intoxication. We agree with the trial court that Daniels remained unshaken in her identification testimony at trial and adequately, indeed convincingly, explained her failure to identify appellant at prior judicial appearances.

Moreover, numerous aspects of Daniels' testimony were corroborated by other witnesses. Thus, Daniels' description of the sequence of events which unfolded the night of the killing was corroborated by William Bud Johnson and two other witnesses, all of whom were at the scene of the murder. Each witness saw and heard the same criminal episode, although each was able to identify a different participant. Their testimony as a whole, however, confirmed the number of participants, the way in which the shooting occurred and the fact that the area was lit well enough to recognize the assailants. Appellant's argument that, based on Daniels' identification, the verdict shocked the conscience, is wholly without merit.

The sufficiency of the evidence argument regarding the corrupt organizations charge is likewise to no avail. The applicable standard is well-settled and quite narrow. We must determine whether, viewing all the evidence at trial, as well as the reasonable inferences to be drawn therefrom, in the light most favorable to the Commonwealth, the trier of fact could have found that each element of the offense was proven beyond a reasonable doubt. Both direct and circumstantial evidence can be considered equally when assessing the sufficiency of the evidence. *Commonwealth v. Hughes*, 521 Pa. 423, 429, 555 A.2d 1264, 1267 (1989); *Commonwealth v. French*, 396 Pa.Super. 436, 578 A.2d 1292 (1990).

As relevant to the instant case, the crime of "corrupt organizations" is defined in the Crimes Code, 18 Pa.C.S. § 911(b)(3) as follows:

(3) It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

The corrupt organizations act further defines "enterprise" and "racketeering activity" as follows:

(3) **"Enterprise"** means any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce.

18 Pa.C.S. § 911(h)(3).

(1) **"Racketeering activity"** means:

(i) any act which is indictable under any of the following provisions of this title:

Chapter 25 (relating to criminal homicide)

. . . .

(ii) any offense indictable under section 13 of the act of April 14, 1972 ... known as The Controlled Substance, Drug, Device and Cosmetic Act (relating to the sale and dispensing of narcotic drugs);

(iii) any conspiracy to commit any of the offenses set forth in subparagraphs (i) and (ii) of this paragraph. . . .

18 Pa.C.S. § 911(h)(1).

Appellant contends that there was insufficient evidence that an enterprise ever existed. This claim borders on the frivolous. Abundant and detailed evidence of the "Family's" drug dealing, and tactics of intimidation and violence was set forth in the record and recounted above. Charles Harris' testimony alone identified appellant as the leader of an association of individuals engaged in a lucrative, organized and ongoing narcotics trade. The enterprise had numerous people working for it. It met regularly, in fact daily, for years to discuss plans for hiding assets, expansion, and other "business" related matters. Harris' testimony was corroborated by several witnesses. Thus, everything to which Harris testified, which alone would defeat an insufficiency challenge on corrupt organizations, was supported by other witnesses who were uncontradicted at trial. In fact, appellant states his insufficiency claim in a wholly conclusory manner, and fails to specify where the Commonwealth's case allegedly fell short. He is not entitled to relief.

■ Appellant's next contention is that the trial court abused its discretion by failing to order a separate trial on the charge of corrupt organizations. Appellant acknowledges, as he must, that the decision whether to sever offenses for trial purposes is entrusted to the sound discretion of the trial court and that the exercise of that discretion will not be disturbed absent manifest abuse. *See, e.g., Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367 (1991); *Commonwealth v. Newman,* 528 Pa. 393, 598 A.2d 275, 277 (1991). Moreover, a bare assertion that a failure to sever has prejudiced a defendant's right to a fair trial, without showing how prejudice occurred, will not support such a claim. Yet, this is precisely what appellant has done here. In fact, the only argument appellant makes on the severance issue is that the jury could not help but be prejudiced after hearing "all the allegations of wrongdoing." The nature of the prejudice is not mentioned nor does appellant articulate a basis for severing the trial other than that the offenses were "totally unconnected".

Our supreme court recently stated the standard by which assertedly erroneous consolidation claims must be judged. It explained:

> Where the defendant moves to sever offenses not based on the same act or transaction that have been consolidated in a single indictment or information, or opposes joinder of separate indictments or informations, the court must determine: whether the evidence of each of the offenses would be admissible in a separate trial for the other; whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, whether the defendant will be unduly prejudiced by the consolidation of offenses.

*Commonwealth v. Lark,* 518 Pa. 290, 300, 543 A.2d 491, 496–497 (1988).

This standard is derived in part from Pennsylvania Rule of Criminal Procedure 1127 which articulates joinder standards as follows:

> A. Standards (1) Offenses charged in separate indictments or informations may be tried together if: (a) the evidence of

each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or (b) the offenses charged are based on the same act or transaction.

Therefore, in order to determine whether the trial court abused its discretion in failing to sever the corrupt organizations charge from the charges of murder, PIC and assault we first must determine whether evidence of each offense would be admissible in a separate trial for the other. In his argument to the trial court on post-verdict motions, appellant conceded that the problem in this realm does not arise with regard to introducing evidence of the murder and drug trafficking in the corrupt organizations case, because these offenses form the "racketeering activity" which constitutes an essential element of that charge. However, appellant argues that severance was required because if appellant were being tried separately on the murder charge, evidence of the corrupt organization offense would not be admissible. We conclude that such evidence would be admissible, and that the first prong of the severance determination, therefore, must be answered in the affirmative.

While it is the general rule that evidence of distinct criminal acts will not be admissible solely to prove that a defendant has a criminal disposition or to prejudice unfairly the jury, such evidence is admissible in well-defined circumstances where it is relevant on other crucial trial issues. *See Commonwealth v. Grekis*, 411 Pa.Super. 513, 529, 601 A.2d 1284, 1293 (1992). Therefore, evidence of other crimes can be introduced when it tends to prove motive, intent, absence of mistake or accident, plan or design, identity, or where such evidence forms a part of the natural development of the facts at issue. *See Commonwealth v. Lark, supra; Commonwealth v. Banks*, 513 Pa. 318, 521 A.2d 1 (1987); *Commonwealth v. Lawson*, 519 Pa. 175, 546 A.2d 589 (1988); *Commonwealth v. Nolen*, 390 Pa.Super. 346, 568 A.2d 686 (1989).

In analyzing the evidence admissible for a separate murder trial, we conclude that the evidence that appellant headed a drug trafficking ring known as the "Family", his

leadership role in the organization, its workings and the identity of its membership [i.e. the evidence at the heart of the corrupt organizations charge] would be probative on a number of issues regarding the murder and would therefore have been admissible at a separate trial for murder. First, among the many legitimate purposes for which the evidence was admissible, evidence of corrupt organizations was relevant to establish motive for the murder.[7]

As the supreme court has reminded us recently: "'[A]lthough motive is not an essential element of the crime, it is *always* relevant and admissible.'" *Commonwealth v. Ward,* 529 Pa. 506, 509, 605 A.2d 796, 797 (1992) (citation omitted; emphasis supplied). In the instant case, appellant's leadership role in the illicit association known as the "Family" was directly probative to explain why the attack on Green and Johnson occurred. As members of a rival gang, Green and Johnson were purportedly attempting to interrupt or at least profit from appellant's drug trade in South Philadelphia. This drug trade, which accounted for colossal profits for appellant and his confederates, was controlled by the "Family", headed by appellant. In this regard, appellant's affiliation with the "Family" provided a motive for him, Wells and Howard to "teach a lesson" to Green and Johnson for allegedly trying to interfere with Kerry Harrison, one of the "Family's" drug dealers. *See Commonwealth v. Hall,* 523 Pa. 75, 84, 565 A.2d 144, 149 (1989) (in a drug-related murder case, the Commonwealth was properly permitted to question defendant about his prior drug dealings to establish motive for the killing—victims had been drug dealers who cheated defendant and had been killed in revenge).

Evidence of corrupt organizations was also relevant on the issue of identity. Appellant's role with the "Family", his constant alliance with Wells and Howard in matters involving drugs and weapons were all probative to corroborate Florence

7. For the sake of simplicity, this court has and will refer to the "murder" charge, when describing the assault on Green and Johnson. Naturally, the evidence relevant to Green's murder was also relevant to the simultaneous attack on Johnson.

Daniels' testimony that appellant was indeed one of the assailants on the street corner the night of the murder. Daniels' testimony, while unshaken on cross-examination, was challenged by her refusal to identify appellant at the line-up which was held right after Teagle's death. Thus, evidence that appellant acted as the head of the gang which orchestrated the assault and his continuous association with Wells and Howard was particularly relevant in a case in which identity remained a critical issue at trial. *See Commonwealth v. Lark,* supra, 518 Pa. at 304–308, 543 A.2d at 498–499 (evidence of terroristic threats made to prosecuting attorney by defendant provided a "critical link in the Commonwealth's chain of evidence introduced to establish the identity of the killer", which was otherwise established by circumstantial evidence).

■ Finally, the evidence of corrupt organizations was relevant to establish the history of the event on trial and was needed to present to the jury the natural development of the case. This aspect of the relevance of "other crimes" has repeatedly been emphasized by our courts. We have acknowledged that in many cases the full, logical and honest development of a case to the jury requires the disclosure of other criminal conduct which is inextricably interwoven with the crime charged. Often, we have stated that the evidence is needed to "complete the story" of the crime on trial. *Commonwealth v. Lark, supra; Commonwealth v. Murphy,* 346 Pa.Super. 438, 499 A.2d 1080, 1082 (1985). This exception to the general rule excluding other crimes evidence, is particularly sensitive to the jury's need to acquire a full understanding of the issues in the case and how and why they relate to one another. Without the evidence of the corrupt organization here, the jury would have been hard pressed to form a clear or accurate picture of what occurred on that street corner in South Philadelphia. Thus, at a separate trial for murder, appellant's activities with the "Family" would plainly have been admissible.[8]

**8.** We are aware, of course, that the admissibility of other crimes evidence, even when one or more of the exceptions apply, must still be assessed in light of the need for such evidence in relation to its potential

In addition, the second prong of the severance inquiry, i.e., whether the evidence was capable of enough separation to avoid confusing the jury, must be answered affirmatively. The crime of corrupt organizations and the crimes of murder and assault are easily distinguishable and capable of remaining separated by the jury both during the trial and during deliberations. *See Commonwealth v. Newman,* 528 Pa. 393, 400, 598 A.2d 275, 279 (1991). While the offenses are related to one another in that the same actors are involved and the drug trafficking provided a unifying theme throughout the case and underlay both offenses, the elements of corrupt organizations and murder are plainly susceptible to independent evaluation by the jury without any undue confusion.

Thus, as the foregoing discussion makes plain, the evidence of corrupt organizations and murder, under the circumstances of this case, would have been admissible in a separate trial for the other and the evidence was clearly distinguishable by the jury. Therefore, as instructed by *Lark,* we turn to the "prejudice" prong of the severance inquiry. The question we address here is whether the danger of prejudice outweighed the benefit of consolidation. *Commonwealth v. Lark, supra,* 518 Pa. at 306, 543 A.2d at 499; *Commonwealth v. Newman, supra,* 528 Pa. at 400, 598 A.2d at 279. As the supreme court noted in *Lark,* the prejudice referred to in the standard "is not simply prejudice in the sense that appellant will be linked to

prejudice. *See Commonwealth v. Taylor,* 299 Pa.Super. 113, 119, 445 A.2d 174, 177 (1982). In our view, as the exposition of the facts of the case reflects, the need for the evidence was strong with regard to genuine issues of motive, identity and development of the history of the case. On the other side of the equation, appellant suggests no way whatsoever in which he was handicapped in his defense or unduly prejudiced by the consolidation.

Further, we note that in cases of joinder of offenses for trial, as opposed to "other crimes evidence" of uncharged offenses, this court has suggested that the balance of factors weighs more heavily in favor of consolidation. First, the danger that the defendant is being called upon to "answer to" uncharged crimes is absent. The Commonwealth must prove both crimes beyond a reasonable doubt. Further, consolidation promotes judicial economy and therefore the interest of "judicial expedience must be weighed against the possibility of resultant prejudice to the appellant." *Commonwealth v. Taylor, supra,* 299 Pa.Super. at 120, 445 A.2d at 177 (citation omitted).

the crimes for which he is being prosecuted, for that sort of prejudice is ostensibly the purpose of all Commonwealth evidence." 518 Pa. at 307, 543 A.2d at 499 (emphasis original).[9] Thus, the *Lark* court explained:

> The prejudice [required for severance] is, rather, that which would occur if the evidence tended to convict appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence.

*Id.*

This kind of prejudice was clearly not present in the instant case. We believe that the supreme court's comments in this regard in *Lark* are particularly apt here as well; that is, that appellant "created" the sequence of events for which he subsequently stood trial. Appellant "forged his own linkage of events" and could not then be heard to complain that he was prejudiced by their joinder for trial. 518 Pa. at 308, 543 A.2d at 500. We conclude that the trial court did not abuse its discretion in refusing to sever the offenses.[10]

**9.** Put another way in a recent federal case: "A showing that a defendant would have a better chance of acquittal in a separate trial does not establish prejudice requiring severance." *United States v. Warner*, 955 F.2d 441, 447 (6th Cir.1992).

**10.** Appellant does not suggest, nor have we found any cases to support, an argument that the instant case should be assessed by a different standard for consolidation because one of the charges involved is "corrupt organizations". Although we have found no Pennsylvania cases which specifically address the consolidation/severance issue in the context of corrupt organization cases, several federal racketeering cases have answered challenges to joinder of offenses for trial. The federal courts consistently determine these claims using the same approach that we use here, that is, "whether that evidence is probative of a material issue other than character." *Huddleston v. United States*, 485 U.S. 681, 684, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771, 779 (1988). For instance, in *United States v. Scarfo*, 850 F.2d 1015, 1020 (3rd Cir.1988), the federal appeals court found that other crimes evidence was relevant to the government's case in that it enlightened the jury regarding the defendant's relationship with a critical prosecution witness whose testimony was indispensable. Likewise, in *United States v. Eufrasio*, 935 F.2d 553 (3rd Cir.1991), a gambling and racketeering case, the defendant sought to sever a murder conspiracy count from the racketeering and other charges, claiming prejudicial joinder. The court found that the cases were properly tried together because evidence of appellants' gambling, extortion and loan-sharking activity would have been admis-

 Appellant also argues that he is entitled to a new trial because the trial court erroneously admitted evidence regarding surveillance and search of a house used for drug trafficking by Howard Willis. Appellant contends that the probative value was outweighed by its prejudicial impact. There is no merit to this claim. Evidence of the drug operations at Howard Willis' house was clearly probative of the extent and nature of the drug organization headed by appellant. Willis was repeatedly identified as one of appellant's "employees" and documentary evidence seized with Willis' name on it confirmed the testimony at trial. When the search warrant was executed at Willis' home, cocaine, drug paraphernalia and two handguns were seized. One of the handguns was consistent with the gun used to assault Lisa Waters. Cocaine, it will be remembered, was the drug in which appellant dealt. In fact, far from the prejudice outweighing the probative value here, we conclude that while the probative value of the contested evidence was high, the potential for undue prejudice was slight. The jury was already informed, through numerous witnesses, that appellant was the ring leader of a large, lucrative and violent drug-trafficking enterprise. Howard Willis' house was a relevant link in appellant's chain of operations but the jury's awareness of its existence could not have effected its impartiality or ability to render a fair decision.[11]

sible in a separate trial for conspiracy to murder and evidence of the murder conspiracy would have been admissible in the RICO trial to prove the nature of the racketeering organization. 935 F.2d at 568–569. Certainly, the same reasoning prevails here.

11. Likewise, in a similar vein, appellant challenges the admission of numerous documents seized by the police. These documentary items, including business papers, receipt books, and other memoranda were seized pursuant to an independent fraud investigation undertaken by the police. The documents contained appellant's name as well as the name of various "business" associates, including Howard Willis. Appellant complains that the evidence was inadmissible hearsay. We agree with the Commonwealth that the documents were not admitted for the truth of the matters asserted therein. These were not "business records" in the ordinary sense, offered to establish the actual workings of a business or to prove the truth of the dealings contained in them. Instead, the evidence was offered and received to show that the parties mentioned therein were associated with one another. *See Common-*

Appellant makes two arguments regarding the prosecution's use of the testimony and prior statements to the police of the witness, Barry Jones. Briefly, the factual background of these challenges is as follows. Jones told the police in a statement given prior to trial that he had accompanied appellant, Wells and Howard to the shooting and described the incident. However, at trial, Jones recanted the earlier statement and said that although he knew the parties, he wasn't present at the assault. He explained that at the time he spoke with police he was serving a sentence for the shooting of Lisa Waters. Jones said he believed that he would be paroled sooner if he gave the statement to police, thereby gaining favor with the Commonwealth. Jones claimed that when this expectation was dashed, he changed his mind about the statement to police. Thus, at trial Jones said he wasn't there. The prosecutor claimed surprise and impeached the testimony with the prior inconsistent statement. The jury was instructed that Jones' statement could be used only for the limited purpose of assessing the credibility of his trial testimony. Finally, it should be noted that Florence Daniels identified Jones from a photograph at trial as one of the men she saw on the street corner the night of the assault on Green and Johnson.

On appeal, appellant claims that the prosecutor improperly referred to Jones' prior statement to police as substantive evidence. This allegation is based on the comment made during the Commonwealth's closing argument that because of Florence Daniels' ability to identify Barry Jones as one of the assailants, Jones' statement "rang true." In reviewing the prosecutor's remarks in the context of his entire

wealth v. Glover, 399 Pa.Super. 610, 613, 582 A.2d 1111, 1113 (1990). Moreover, if it was error to admit these documents, the admission was harmless. The relationships to which they attested were amply established elsewhere, and the Commonwealth made no use of the substantive matters to which they referred. In fact, it was defense counsel in closing argument who made repeated use of the "contents" of the now-challenged records to argue that appellant was nothing but a small-time, inept businessman. Thus, the records served the defense more than the Commonwealth. See Commonwealth v. Newman, 382 Pa.Super. 220, 238, 555 A.2d 151, 160 (1989).

trial and all the evidence presented, we conclude that appellant is not entitled to a new trial on the basis of this claim. *Commonwealth v. Smith*, 490 Pa. 380, 386, 416 A.2d 986, 989 (1980). This court had held that while the prosecutor may not deliberately seek to prejudice the jury or stigmatize the defendant to such an extent that the jury can no longer deliberate dispassionately on guilt or innocence, every objectionable remark will not require a new trial. Only statements by the prosecutor which have the "unavoidable effect" of prejudicing the jury will require reversal. *See Commonwealth v. Jones*, 391 Pa.Super. 292, 310, 570 A.2d 1338, 1348 (1990); *Commonwealth v. Strong*, 522 Pa. 445, 452, 563 A.2d 479, 483 (1989). In light of this standard, the prosecutor's fleeting remark which arguably could be construed as referring to Jones' testimony as substantive evidence does not require a new trial. First, the comment was spoken in terms of evaluating Daniels' testimony and the remark about Jones could fairly be characterized as an aside. Moreover, since the prosecutor did not directly argue the substantive credibility of Jones' prior statement, the reference to it, especially in the context of the lengthy closing argument, can be described as obscure, at best. Finally, the trial court admonished the jury, on more than one occasion, that Jones' prior statement could not be considered as substantive evidence and could only be used for the limited purpose of "deciding whether or not to believe Mr. Jones' testimony here in court." The jury was charged both initially and again in response to repeat the original charge about how it should treat Jones as a witness.[12]

12. Appellant challenges, in a separate claim, this portion of the court's charge. He argues that the trial court erred because it failed to define the word "substantive" for the jury. It is axiomatic that a trial court need not use specific language in its charge to the jury and that a challenged portion of court's instructions must be read in context. *Commonwealth v. Prosdocimo*, 525 Pa. 147, 149, 578 A.2d 1273, 1274 (1990). Here, the word substantive was used in contrast to the credibility determination, i.e., whether or not to believe Jones' trial testimony. This clearly drawn distinction precisely conveyed the meaning of the "substantive" in the context in which it was used. We note that when the jury asked the trial court to repeat its initial instruction regarding Jones, it asked that that portion of the charge be re-read and did not ask the court to define or elaborate on any particular word or concept.

Since the jury was properly instructed regarding the possible use of Jones' prior statement and because the reference to it cannot be characterized as overreaching, no new trial is required.[13]

██ Appellant also challenges another aspect of the Commonwealth's closing argument. In recapitulating the evidence at trial and urging the jury to return guilty verdicts for all co-defendants, the prosecutor remarked, "if you want to let them walk out of here, do so." A defense objection was sustained and no further relief was requested. Thus, the issue regarding the allegedly improper remark has not been preserved for review. *Commonwealth v. Chimenti*, 362 Pa.Super. 350, 524 A.2d 913, *allocatur denied*, 516 Pa. 639, 533 A.2d 711 (1987). Moreover, in our view, this claim of prosecutorial misconduct wholly lacks merit. The prosecutor was merely urging the jury, "within the bounds of vigorous oratory permitted a prosecutor in closing argument", to follow the direction of the evidence as the Commonwealth saw it and convict on first degree murder. *Commonwealth v. Jones*, 530 Pa. 591, 617,

We further note that when the court first instructed the jury, there was no objection by defense counsel regarding the accuracy or clarity of the challenged portion to the charge. Under these circumstances there is no basis upon which to grant relief.

In addition, appellant's second complaint regarding the court's charge, i.e. the adequacy of the corrupt organizations instruction, has been waived. No defense objection to the charge as given was made. In any event, the trial court fully apprised the jury of the elements of corrupt organizations and the racketeering activity which must be shown in order to prove it beyond a reasonable doubt.

13. In addition, as the Commonwealth maintains, if a new trial were to be granted here, the statement itself would be admissible as substantive evidence, as appellant concedes. The law is now abundantly clear that prior inconsistent statements of a non-party witness are admissible at trial as substantive evidence as well as for impeachment purposes. *Commonwealth v. Brady*, 510 Pa. 123, 507 A.2d 66 (1986). Thus, assuming the prosecutor's remark provided the basis for granting a new trial, which we conclude it did not, the same statement would now be admissible at the new trial as substantive evidence. *See Commonwealth v. Lively*, 530 Pa. 464, 610 A.2d 7 (1992). *See also Commonwealth v. Hall*, 523 Pa. 75, 86, 565 A.2d 144, 150 (1989) (counsel cannot be deemed ineffective for failing to raise an objection to the use of prior statements as substantive evidence in a pre-*Brady* case, because the complained-of evidence would be admissible if appellant were retried as he requested).

610 A.2d 931, 943 (1992). This remark did not appeal to bias nor provoke hostility nor inflame the jury and there is no basis for relief here.

 Finally, appellant argues that he received inadequate notice of the predicate acts which would form the basis of the corrupt organizations prosecution. Although not clearly stated, the gist of appellant's argument appears to be the asserted failure of the trial court to order some sort of formal revelation by the Commonwealth on the predicate offenses underlying the corrupt organizations charge. He argues that the trial court erred in failing to reveal to him prior to trial the grand jury's presentment. The record does not reveal where such a request was made by defense counsel. In addition, even if it had been made, appellant cites absolutely no item of prejudice which flowed from this supposed concealment. Moreover, the grand jury presentment is a recapitulation of the witnesses' testimony and the Rules of Criminal Procedure specifically provide that "such testimony may be made available only after the direct testimony of that witness at trial." Pa.R.Crim.P. 263(b). That procedure was followed here. In any case, appellant's assertion of lack of notice is empty. There were two preliminary hearings in the instant case, at which the heart of the Commonwealth's case was revealed to appellant. As the trial court correctly stressed, "there was no mystery as to the acts upon which the Commonwealth built its case."

In accordance with the above findings, we affirm the judgment of sentence.