J. S53039/17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :     IN THE SUPERIOR COURT OF
                                   :             PENNSYLVANIA
              v.               :
                                   :
SAMMIE CAMPBELL,           :          No. 996 EDA 2016
                                   :
          Appellant      :

Appeal from the Judgment of Sentence, February 24, 2016,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-0013197-2008

BEFORE:  BENDER, P.J.E., OLSON, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:     **FILED OCTOBER 25, 2017**

Sammie Campbell appeals from the February 24, 2016 judgment of sentence entered in the Court of Common Pleas of Philadelphia County after a jury convicted him of attempted murder, conspiracy, and possessing instruments of crime.[1]  The trial court imposed an aggregate sentence of 42½ to 85 years of imprisonment.  We affirm.

The trial court summarized the relevant factual and procedural history as follows:

> The underlying case, which is the subject matter of the instant appeal, stems from the arrest of [appellant] for his active participation with at least two other men in two related shooting battles on September 12, 2007 between rivaling "5th Street and 7th" Street" gangs in South Philadelphia, which resulted in multiple gunshot wounds being inflicted

---

[1] 18 Pa.C.S.A. §§ 901, 903(a)(1), and 907, respectively.

upon complainant Anthony Alonzo Reid. Under docketed case number CP-51-CR0013196-2008, [appellant] was charged with First Degree Felony offenses, including Aggravated Assault and Conspiracy, based upon the report of off duty officer Christine Valentine that she observed [appellant] fire a handgun multiple times at a group of unknown males who were also shooting handguns in his direction. The shootings occurred on the street and sidewalk near where she and another innocent bystander had been standing, within the 400 and 500 residential blocks of Mifflin Street in South Philadelphia.

The charges docketed under CP-51-CR-0013197, which is currently the subject of the instant appeal, included Criminal Attempted Murder (H1), Conspiracy-Engaging-Murder (F1) and Possession of Criminal Instrument (M1). These charges were based upon information that [appellant], and at least two co-conspirators Marklem Vicks ("Markeem"), and Maurice Wilkerson ("Reese"), fired in excess of thirty rounds of ammunition from multiple firearms, including an AK-47 type assault rifle carried by [appellant], aimed at a group of people standing at or near the corner of the 500 block of Moore Street at approximately 9:57 p.m. This shooting incident occurred in retaliation for a shooting battle on Mifflin Street that occurred a few hours earlier that day as part of an ongoing feud between rival gangs. The onslaught of assault rifle and semi-automatic weaponry upon the 500 block of Moore Street resulted in multiple near fatal gunshot wounds being inflicted upon complainant Anthony Alonzo Reid, also known as "Trome." Mr. Reid was later killed in another shooting incident committed by unknown persons. No charges were ever filed against [appellant] for the homicide of Anthony Reid.

All pending related offenses from both captioned matters filed against [appellant] initially proceeded to trial before the Honorable Rosalyn Robinson, Judge of the Court of Common Pleas First

Judicial District of Pennsylvania Criminal Division, sitting as fact finder without a jury on March 5, 2010. [Appellant] was found guilty of all charged offenses, and subsequently sentenced by the trial court on April 23, 2010. A direct appeal was filed by [appellant's] trial counsel, James Marsh, Esquire and discontinued on October 7, 2010. On July 11, 2011, [appellant], by and through trial counsel, James Marsh, Esquire, filed a timely Petition pursuant to the Post Conviction Relief Act [("PCRA")[2]] on all related docket numbers.

After several delays, following video and recorded evidentiary hearings on February 10, 2012, the Honorable Rosalyn Robinson granted [appellant's] PCRA Petition in part, as to both cases docketed under CP-51-CR-0013196-2008 and CP-51-CR-0013197-2008, finding that trial counsel James Marsh, Esquire was ineffective for failing to investigate a potential witness Erlene Muirhead, who surfaced a few years after the arrest of [appellant] for the instant charges. The Commonwealth filed a Motion for Reconsideration Of the Order, entered on February 10, 2012, which was denied by the trial court on February 15, 2012. The Commonwealth then filed an Appeal to the Superior Court. On July 16, 2013, the Superior Court affirmed the trial court's Order entered February 10, 2012, and both matters were remanded for new trial.

In the interim of this lengthy litigation involving [appellant], the complainant in the instant matter, Anthony Alonzo Reid, was shot and killed by unknown persons. Gihad Topping, an acknowledged 5th Street gang member and eyewitness to the shooting of Mr. Reid in the instant matter, was incarcerated for unrelated crimes and experienced intimidating interactions with at least one of [appellant's] associates while being transported from different prison locations. [Appellant's] co-conspirators, Marklem Vicks, also known as Markheem Vicks, and Maurice Wilkerson, entered

---

[2] 42 Pa.C.S.A. §§ 9541-9546.

respective pleas of guilt admitting their participation as co-conspirators with [appellant] in the subject shooting incident at issue on the 500 block of Moore Street that seriously injured Anthony Reid. Notably, each co-conspirator has filed various appeals of their respective convictions or pursued claims under the [PCRA] for various reasons.

On October 31, 2014, Mark Keenheel, Esquire entered his appearance as trial counsel on behalf of [appellant] in the cases docketed under CP-51-CR-0013196-2008 and CP-51-CR-0013197-2008, and filed a Motion to Exclude Prior Testimony and a Motion for Separate Trials. The Motions in Limine was [sic] heard and appropriately denied by the Honorable Robert Coleman, after full and fair hearings on December 15, 2014 and January 9, 2015 respectively. Following several defense delays, the cases docketed under CP-51-CR-0013196-2008 and CP-51-CR-0013197-2008 proceeded again to trial before a sworn jury as fact finders and this presiding jurist the Honorable Ann Marie B. Coyle Judge of the Court of Common Pleas for the First Judicial District Criminal Division on December 8, 2015.

On December 15, 2015, the jury entered verdicts of guilty to the charges of Attempted Murder (H1), Conspiracy (F1), and Possession of Instrument of Crime (M1) docketed under CP-51-CR-0013197-2008, related to the second shooting incident at 5th and Moore Streets and acquitted [appellant] of the charges related to the earlier shooting incident within the 400 block of Mifflin Street docketed at CP-51-CR-0013196-2008. Presentence Investigative Reports and Mental Health Assessments were ordered. On February 18, 2016, [appellant] filed a Pro Se Motion For New Trial And/Or Arrest of Judgment. On February 24, 2016, this trial court denied the [appellant's] Pro Se Motion For New Trial And/Or Arrest of Judgment and formally sentenced [appellant] accordingly.

[Appellant's] Pro Se Notice of Appeal to the Superior Court was filed on March 23, 2016. Carson

> Blythe Morris, Esquire entered his appearance as [appellant's] appellate counsel on March 24, 2016. This trial Court issued the Order Pursuant to [Pa.R.A.P.] 1925(b) on April 4, 2016, and the Order Granting [appellant's] Motion for Extension Of Time on June 16, 2016. [Appellant's] Statement of Matters Complained [of] on Appeal was filed on June 30, 2016.

Trial court opinion, 3/17/17 at 1-5.

In its Rule 1925(a) opinion filed on March 17, 2017, the trial court incorporated the October 19, 2016 opinion filed by The Honorable Robert Coleman who entered pre-trial orders that denied appellant's motion to exclude prior testimony and motion to sever the two related cases.

Appellant raises the following issues for our review:

[1.] Did the trial court violate its duty to remain impartial during appellant's trial when it expressed disbelief and disdain towards witness Markeem Vicks who provided testimony exonerating appellant?[3]

[2.] Did the Commonwealth engage in prosecutorial misconduct by knowingly misrepresenting to the jury a critical fact in appellant's case – that Erlene Muirhead, an alibi witness who testified on appellant's behalf, only came forward as a witness **after** appellant's first trial – when the assigned prosecutor knew this representation to be false?

[3.] Did the trial court abuse its discretion by admitting two recorded prison conversations allegedly involving Maurice Wilkerson when one of these calls was not authenticated and

---

[3] Appellant fails to identify and explain the testimony that he claims that Commonwealth witness Marklem Vicks a/k/a Markeem Vicks provided that was "exonerating" to appellant.

> both were irrelevant and highly prejudicial to appellant's case?

Appellant's brief at 3 (capitalization omitted; emphasis in original).

Appellant first complains that "during Markeem Vicks' testimony, the Trial Court engaged in precisely the sort of 'expression[s] indicative of favor or condemnation' and 'doubt as to [] witnesses' credibility' forbidden in the Commonwealth's courts." (Appellant's brief at 29 (brackets and internal punctuation in original).) In support of this claim, appellant sets forth a select and limited portion of a colloquy that took place during Mr. Vicks's direct examination by the Commonwealth. A review of that portion of the colloquy reveals that it took place outside of the jury's presence. Additionally, a review of the transcript demonstrates that prior to excusing the jury, the trial court attempted to control the Commonwealth's direct examination of Mr. Vicks because Mr. Vicks was not answering the questions posed by the prosecutor and because the prosecutor and Mr. Vicks often spoke at the same time, as follows:

> THE COURT: Excuse me. Here's how this is going to go, sir --
>
> [MR. VICKS]: Yes, ma'am.
>
> THE COURT: Listen to the question. Answer the question. Wait till he finishes the answer to the question.
>
> I'm not going to have run-on speaking to the things that are not on the table.

Notes of testimony, 12/9/15 at 205.

The Commonwealth's direct examination resumed, as follows:

Q. Mr. Vicks, are you now telling us that you didn't have time to think about your decision to plead guilty?

A. At the time when they offered and told me that it was an open plea or whatever the case may be, I came in the court and made an issue that I need time to consult with my family.

The girl I was dealing with at the time was pregnant. This is things [sic] I wasn't running over with my family; this is a decision you [sic] trying to ask me to make (indicating) like this, like, let's go to the store; let's go to the movies. You are trying to give a life-changing decision right then and there.

So this is not something we talked about for months, and it was just lingering in the air.

They called me from the basement and said, this is what's going on. And I'm like whoa, whoa, you know what I'm saying; I need some time to think on this. Let me call my dad or let me talk to somebody to see if this is the right thing to do or you know, whatever the case may be. So I go back there and I think, you know, for my action. I think about the time, I can go ahead and get this time. So I might as well go try and get this time --

THE COURT: Excuse me --

[MR. VICKS]: And that's what was going on.

THE COURT: Excuse me. Hello.

[MR. VICKS]: Yes, ma'am.

THE COURT: Next question.

[THE COMMONWEALTH]: Thank you, Your Honor.

*Id.* at 205-207.

At this point, the Commonwealth attempted to resume Mr. Vicks's direct examination when defense counsel objected as follows:

> [DEFENSE COUNSEL]: Your Honor, may I have an objection, please?
>
> THE COURT: To what?
>
> [DEFENSE COUNSEL]: Can we have a sidebar?
>
> THE COURT: To what?
>
> [DEFENSE COUNSEL]: Can we have a sidebar hearing?
>
> THE COURT: No. There's no need. I specifically gave directions, okay? I don't need run-on continuing; I just need question and answer.
>
> Next question.
>
> [DEFENSE COUNSEL]: Well, my objection initially was, the DA was the one interrupting his answers, it wasn't him. And I would still like to have a sidebar.
>
> THE COURT: No. Overruled.
>
> [MR. VICKS]: Can I ask for some water, please --
>
> THE COURT: Sir --
>
> [MR. VICKS]: -- my mouth dry [sic], Miss. Please.
>
> Thank you.
>
> THE COURT: We are going to take a break.

*Id.* at 207-208.

At this point, the jury exited the courtroom, Mr. Vicks was excused, and the following occurred:

> THE COURT:  What is the nature of your objection?
>
> [DEFENSE COUNSEL]:  My objection is you, Your Honor.  You show the utmost disgust with this witness testifying.
>
> THE COURT:  Because he's going on and on past the question --
>
> [DEFENSE COUNSEL]:  May I finish?
>
> THE COURT:  No, you may not.  Look, I said three times how this is going to go.  Nobody seems to be listening.  She asks a question, you are supposed to answer the question.  If he doesn't answer the question, somebody raise an objection and move on.  We are not going to have on and on and on discussions, well past the nature of the question.
>
> [DEFENSE COUNSEL]:  Your Honor, my objection was, counsel for the district attorney was interrupting his answers, that was my objection.  But you are showing utmost disgust for this witness testifying, and it's sending bad signals to the jury.
>
> You are doing all kinds of things up there, where the jury --
>
> THE COURT:  What kinds of things are you saying I'm doing?
>
> [DEFENSE COUNSEL]:  You are doing like this, you are going like that (indicating).  You are doing all kinds of stuff.
>
> [THE COMMONWEALTH]:  Objection.
>
> THE COURT:  Oh, please.  Oh, stop it.  You know what?  No.

> The only thing I'm doing, sir, is trying to move this case along and trying to move the testimony along to the point where it's supposed to go along. I don't need to have long dissertations about what he thinks in life, all right? That's not why we are here; we're here for relevant questions and answers.
>
> So your objection is noted and it is incorrect and overruled, and I take exception to it. I'm taking five.

*Id.* at 208-210.

In the argument section of his brief on this issue, appellant complains that "[b]ecause the [trial] [c]ourt's conduct violated its duty to remain impartial and not interject itself into [a]ppellant's trial or express disbelief or disfavor towards witnesses, the fairness of [a]ppellant's trial was irreparably compromised by the [c]ourt's actions and [appellant] should be granted a new trial." (Appellant's brief at 27.) Appellant then argues that because the transcript indicates that the trial court did not deny defense counsel's accusation that the trial court was disgusted by Mr. Vicks, this serves as some kind of proof that the trial court harbored bias against appellant. From this baseless foundation, appellant makes the illogical and unsupported leap that "[b]ecause the [trial] [c]ourt communicated to [a]ppellant's jury, through its expressions of disgust and exasperation, that it did not believe the testimony of Mr. Vicks, whose testimony was critical to [a]ppellant's defense, it effectively discredited [a]ppellant's entire defense and prejudiced him at trial." (Appellant's brief at 35.)

Appellant failed to preserve this claim for our review because appellant's counsel failed to make a request for mistrial or a curative instruction. *See Commonwealth v. Chimenti*, 524 A.2d 913, 921 (Pa.Super. 1987) (citation omitted) (reiterating that where defense counsel objects but fails to request a mistrial or a curative instruction when an alleged prejudicial event occurs, the issue is not preserved for appellate review). Even if preserved for our review, however, the claim entirely lacks merit. There is not one scintilla of record support to demonstrate that the trial court conveyed to the jury that it disbelieved Mr. Vicks or that it violated its duty of impartiality so as to "effectively discredit[] [a]ppellant's entire defense and prejudice[] him at trial." To the contrary, the transcript reveals that Mr. Vicks continuously failed to answer the questions being posed to him and that the trial court properly directed him to answer the questions posed in an effort to move the proceedings along.

Appellant next complains that his convictions should be vacated because the Commonwealth engaged in prosecutorial misconduct by "knowingly present[ing] a falsehood to the jury" during Erlene Muirhead's cross-examination and during the prosecution's closing argument "that Erlene Muirhead only came forward with an alibi defense on [a]ppellant's behalf *after* his first trial and *after* Anthony Reid was killed." (Appellant's brief at 41 (emphasis in original).) In the argument section of his brief on this issue, appellant once again sets forth only a select and limited portion of

the colloquy that took place during Ms. Muirhead's cross-examination in an effort to support his claim, as follows:

> Q.     So 2011, you start talking to somebody from Mr. Perri's [appellant's PCRA counsel's] office?
>
> A.     I spoke to one person.  I went in to an office and gave an affidavit.  I haven't spoken to anyone else pertaining to this case at all, after that.
>
> Q.     And again, that was July 2011 that you went in and gave an affidavit about being an alibi?
>
> A.     Yes.
>
> Q.     We never heard two words about it until then, right?
>
> [DEFENSE COUNSEL]:  Objection, Your Honor.
>
> [MS. MUIRHEAD]:  No, that's not true.  His first lawyer --
>
> THE COURT:  Rephrase it.
>
> [THE COMMONWEALTH]:  I'll move on.

Appellant's brief at 40, citing notes of testimony, 12/14/15 at 57.

The relevant colloquy, in its entirety, however, is as follows:

> Q.     And you certainly, throughout the years, kept in contact with [appellant], right?
>
> A.     Yes.
>
> Q.     You've actually seen him quite a few times since this incident, right?
>
> A.     Yes.
>
> Q.     And you've talked about what happened?

A.     Yes, but not too much.  It's not too much of a focus, because he didn't commit a crime.

Q.     It's not too much of a focus --

A.     Yes.

Q.     -- that he's been charged with attempted murder?

A.     Yes, because he wasn't there.

Q.     Because he was with you --

A.     Yes.

Q.     -- not smoking weed, watching the Godfather and having sex?

A.     No.  I said I wasn't smoking weed.

Q.     You visited him in August 2008?

A.     Yes.  I just turned 18.  I was able to see him now.

Q.     You visited him again later in August 2008?

A.     Yes.  He was still my boyfriend.

Q.     You visited him in September 2008?

A.     Yes.

Q.     You were aware that he had court dates all during those times, right?

A.     Yes.

Q.     But you and him [sic] didn't talk about the case, because it wasn't a focus?

A.   No, it wasn't really a focus; our relationship was.  We were going through ups and downs.

Q.   You visited him in December of 2008?

A.   Okay.

Q.   February 2009.  Is that a yes?

A.   Yes.

Q.   March 2009?

A.   Yes.

Q.   June 2009?

A.   If I recall.

Q.   You visited him in 2010?

A.   Yes.

Q.   I don't want any details; I just want a yes or no answer.  Were you aware that he had a four-day hearing in 2010, just yes or no?  Just yes or no?

A.   I don't recall.

Q.   Well, you never testified in 2010, did you?

A.   No.  Not that I recall.

Q.   But you and [appellant] had been in good contact, good terms.  You had been visiting him quite often, '08, '09, 2010?

A.   Around the time --

Q.   Ma'am, again, not trying to be rude.  Just yes or no.  You had good contact with Mr. --

A.   Yes.  We didn't --

- 14 -

Q. -- [appellant]?

A. Actually, we did not have good contact. Sometimes my phone would be off. I may pop up at a visit, but he wouldn't be able to reach me on certain occasions.

Q. Then in 2011 -- well, first of all, did you know Trome, Anthony Reid?

A. No.

Q. You didn't find out that he got killed in 2011? July 2011?

A. No.

Q. You didn't know that?

A. No. I don't -- I'm not --

Q. But suddenly in July 2011, you come forward with an affidavit that says [appellant] was with you at the time of the shooting?

A. Is that the young man that supposedly got shot that night?

Q. Yes.

A. That's what I said, I don't know him. I don't. I never [sic] heard of him.

Q. Is it fair to say, July 2011, you did not know that Anthony Reid had been killed, but that's when your affidavit pops up, saying that you are actually an alibi witness?

A. Yes.

Q. And here we are, 2015.

A. Yes.

Q.    Do you know Reese?  Maurice Wilkerson?

A.    I don't know these people by their full names, I just know them by -- I think I know Reese.

      Is he from my neighborhood?  From down South Philadelphia?

Q.    Right.  Like from 7th Street?

A.    Oh.  Yes.

Q.    If I showed you a picture of Reese, would you recognize it?  And I'll just show you a paper copy so you don't have to lean too far forward.

[]    I'm showing you the third page of C-24.  Do you know this guy?

A.    Yes.  Yes, I do.

Q.    This is Reese?

A.    Yes.

Q.    He hangs out with [appellant], doesn't he? That's one of his friends from the neighborhood?

A.    Well yes, but I wouldn't -- I didn't meet a lot of his guy friends, because I stayed to myself.  I was at work a lot.

Q.    Where were you working at the time?

A.    Burger King.

Q.    After school?

A.    Yes.

Q.    But you didn't work on this day?

A.    No.

Q.    You had that date off?

A.    Yes.

Q.    Do you know this guy, Markeem?

A.    Yes.

Q.    Showing the 4th page of C-25 --

A.    Yes, I do know Markeem.

Q.    I'm sorry, that was C-24.

       You know Markeem too, right?

A.    Yes.

Q.    From the neighborhood?

A.    Yes.

Q.    From 7th Street?

A.    Yes.

Q.    Do you know -- did you ever talk to Maurice's lawyer --

A.    No.

Q.    -- Mr. Perri?

A.    No.

Q.    But there did come a time when you spoke with, not [defense counsel] Mr. Keenheel, but a new lawyer from Mr. Perri's office, right, about [appellant's] case?  Just yes and no?

A.    Yes.

Q. So Reese had Mr. Perri, and then?

[DEFENSE COUNSEL]: Objection, Your Honor. She's testifying.

THE COURT: What's your question? Ask a question, please?

[BY THE COMMONWEALTH]:

Q. If, and maybe you don't know, but if Reese had been represented by Mr. Perri --

[DEFENSE COUNSEL]: Again, objection, Your Honor --

[THE COMMONWEALTH]: --pertaining to this case --

THE COURT: Can I hear the question, please? Thank you. What is the question?

[BY THE COMMONWEALTH]:

Q. If Reese had been represented by Mr. Perri's office and then you had contact with a lawyer from Mr. Perri's office, that's the same law firm, right?

A. I guess.

Q. So 2011, you start talking to somebody from Mr. Perri's office?

A. I spoke to one person. I went in to an office and gave an affidavit. I haven't spoken to anyone else pertaining to this case at all, after that.

Q. And again, that was July 2011 that you went in and gave an affidavit about being an alibi?

A. Yes.

> Q. We never heard two words about it until then, right?
>
> [DEFENSE COUNSEL]: Objection, Your Honor.
>
> [MS. MUIRHEAD]: No, that's not true. His first lawyer --
>
> THE COURT: Rephrase it.
>
> [THE COMMONWEALTH]: I'll move on.

*Id.* at 50-57.

The record reflects that the Commonwealth elicited a fair amount of testimony from Ms. Muirhead -- without objection by appellant -- that cast doubt on Ms. Muirhead's provision of an alibi for appellant. Moreover, when defense counsel did object to a question posed by the Commonwealth, the specific objection was that the Commonwealth was testifying for the witness. The select and limited portion of the colloquy that appellant sets forth in his brief occurred immediately after defense counsel's objection that the Commonwealth was testifying for Ms. Muirhead. A review of the relevant colloquy in its entirety supports the conclusion that the objection set forth in the select and limited portion of the colloquy that appellant relies on was another objection that the Commonwealth was testifying for Ms. Muirhead. Nevertheless, at no time did appellant move for a mistrial or request a curative instruction or any other relief at the time of the alleged prejudicial prosecutorial misconduct during the Commonwealth's cross-examination of

Ms. Muirhead or during its closing argument. Therefore, appellant waives this issue on appeal. *See Chimenti*, 524 A.2d at 921.

Appellant finally complains that the trial court abused its discretion when it admitted into evidence recordings of two prison conversations during Maurice Wilkerson's direct examination because the voice on one of the recordings was not authenticated by Mr. Wilkerson as being his voice and both recordings were irrelevant and prejudicial to appellant.

The record reflects that the Commonwealth sought to play recordings of a June 19, 2008 prison call, as well as an April 16, 2010 prison call, during Maurice Wilkerson's direct examination. Defense counsel first objected on the basis that the recordings were not on the Commonwealth's exhibit list. (Notes of testimony, 12/9/15 at 227-230.) Although appellant abandons this claim on appeal,[4] he seizes upon defense counsel's statement during the colloquy on that particular objection that "[it] has nothing to do with [appellant]" in a seeming attempt to convince this court that he preserved his claim that the recording was irrelevant. Additionally, although appellant seizes upon another objection that he made that "[it] has nothing to do with [appellant,]" a review of the record reveals that that objection occurred prior to the recordings being played to the jury and as a direct result of the Commonwealth asking Mr. Wilkerson how he felt about the victim, Anthony Reid, making a statement to law enforcement. (Appellant's

---

[4] Appellant's brief at 50 n.12.

brief at 54-55; notes of testimony, 12/9/15 at 259.) We admonish counsel for repeatedly misrepresenting the record in his brief to this court.

That being said, we will now dispose of appellant's final complaint. The record reflects that following defense counsel's objection regarding the exhibit list, the following then took place:

> THE COURT: Aside from the objection previously noted, is there any other objection to the call[?]
>
> [DEFENSE COUNSEL]: Yes, Your Honor. I mean, there has to be some foundation or something to introduce that it was his call.
>
> I mean, normally someone from the prison would come in and say, this is his number, this is his call, whatever. There's [sic] no voice experts here. We don't know who he's talking to. I haven't heard it. We have hundreds of those calls. I haven't even heard the call she's talking about. If she had given us –
>
> THE COURT: Excuse me.
>
> Can I see you at sidebar, please.
>
> - - -
>
> (Discussion held at sidebar as follows:)
>
> - - -
>
> THE COURT: In terms of the objections as to not being on the witness list, I've already addressed that and overruled that, but in terms of the objection as to authenticity of the phone calls, my understanding is, Commonwealth is going to ask him, does he recognize his voice, right?
>
> [THE COMMONWEALTH]: Yes.

> [DEFENSE COUNSEL]: I don't know.
>
> [THE COMMONWEALTH]: Yes.
>
> THE COURT: Well, I can't rule on that until he says yes or no, right?
>
> [DEFENSE COUNSEL]: Well, I think you should hear his voice outside the jury's presence then.
>
> THE COURT: No. That doesn't need to happen. He can authenticate it.
>
> So your objection is noted and overruled.

Notes of testimony, 12/9/15 at 255-256.

The record then reflects that Mr. Wilkerson confirmed his voice as being a participant in the June 19, 2008 recorded telephone call. (*Id.* at 257.) Mr. Wilkerson then denied that he participated in the April 16, 2010 call, as follows:

> Q. . . . Do [you] recognize the voice on this call?
>
> A. Not at all.
>
> Q. Do you recognize your voice?
>
> A. No.
>
> Q. That's not your voice? Let me continue and see if you recognize that.
>
> - - -
>
> (Prison tape being played.)
>
> - - -
>
> [BY THE COMMONWEALTH]:

Q.     Who's there saying they are trying to get me to take a deal and all that?

A.     I don't recognize neither [sic] voice. I know my voice when I hear it.

Q.     Well I know it's a little hard to hear. Sorry about that.

- - -

(Prison call played to the jury.)

- - -

[MR. WILKERSON]: That's not me.

[BY THE COMMONWEALTH]:

Q.     Let's just listen a little longer.

[DEFENSE COUNSEL]: I'm going to object, Your Honor. He said it's not him.

[THE COMMONWEALTH]: May I forward it to another section and ask if he recognizes the voice, Your Honor?

THE COURT: Is this a different day?

[THE COMMONWEALTH]: It's later in the call, Your Honor.

[DEFENSE COUNSEL]: I'm going to object, Your Honor.

[THE COURT]: We'll see.

- - -

(Prison call played to the jury.)

- - -

[BY THE COMMONWEALTH]:

Q. "They [sic] going to bury the rat and you are all going to get off."

Do you know who said that?

A. I don't know who that is.

Q. You don't?

A. No, I really don't.

Q. You don't know who that caller was on the other end of the prison call?

A. That don't [sic] even sound like me. I don't know it [sic] either voice. Either voice.

Q. So you don't know who said they are going to bury the rat and you all are going to get off?

A. No. Did he get buried?

[THE COMMONWEALTH]: Does someone find that funny in the gallery?

I have nothing further for Mr. Wilkinson [sic].

Notes of testimony, 12/9/15 at 261-262.

A review of the relevant colloquy demonstrates that Mr. Wilkerson authenticated his own voice with respect to the June 19, 2008 recording. Although Mr. Wilkerson then denied being a participant in the April 16, 2010 recorded telephone call, Pennsylvania Rule of Evidence 901(b)(3) permits the trier of fact to compare authenticated evidence with other evidence in order to satisfy the authentication requirement with respect to the latter. *See* Pa.R.E. 901(a) and (b)(3) ("[t]o satisfy the requirement of

authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims[,]" an example of which includes a "comparison with an authenticated specimen by . . . the trier of fact."). Therefore, the jury, as fact finder, was free to conclude that the voice on the April 16, 2010 recording was or was not that of Mr. Wilkerson by comparison to the June 19, 2008 authenticated recording.

With respect to the objection that defense counsel made during Mr. Wilkerson's testimony that concerned the second recording, a review of the record demonstrates that defense counsel made an asked and answered objection. Moreover, at no time during Mr. Wilkerson's testimony or during the Commonwealth's closing argument did appellant move for a mistrial or request a curative instruction or any other relief based on the prejudicial nature of the admission of the recorded evidence which appellant now claims was "highly inflammatory and prejudicial" so as to entitle him to a new trial. (Appellant's brief at 57-58.) Therefore, appellant waives this issue on appeal. **See Chimenti**, 524 A.2d at 921.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/25/2017